# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GOTSPACE DATA LLC, GOT CAPITAL, LLC )
GOTSPACE DATA PARTNERS, LLC OCEAN )
DEVELOPMENT PARTNERS, LLC, GOTSPACE )
DEVELOPMENT, LLC OCEAN DEVELOPMENT )
PARTNERS PRECINCT 1, LLC. OCEAN VACATION )
REALTY TRUST, NICHOLAS FIORILLO TRUSTEE, )
NICHOLAS FIORILLO, )
Individually, )
  )
  )
      Plaintiffs )
v. )
  )
NE EDGE, LLC, NSO GROUP TECHNOLOGIES )
LIMITED WESTBRIDGE TECHNOLOGIES, APPLE INC. )
INC., T-MOBILE, TRACK VIEW, STEIN FIBERS )
ALL OF US AT NORTH, LLC, VERDE GROUP LLC. )
ROUTE 44 DEVELOPMENT, LLC, 18 QUEEN ANNE )
LLC, GF FUNDING, LLC, RISING TIDES, LLC, )
S&Q DATA, LLC, S&J STORAGE BROS. LLC. )
CROWD LENDING, LLC, CITY OF BOSTON, )
BOSTON POLICE DEPARTMENT, MAYOR MICHELLE )
WU, individually, and as Mayor of the City of Boston; )
KEVIN HAYDEN, individually and as District Attorney )
of Suffolk County, BOSTON MUNICIPAL COURT )
OFFICER MICHAEL POWERS, DETECTIVE KARL )
DUGAL, individually and in their official capacity, )
KEVIN T. PETERS, RAYMOND C. GREEN, )
PETER SPITALNY, SAMUEL SPITALNY, )
THOMAS QUINN, GEORGE MCLAUGHLIN, )
DANIEL MCLAUGLIN, DANIEL NAJARIAN, )
NICHOLAS NESGOS, STUART BORNSTEIN, )
JEFFREY HELLMAN, BRIAN SHEEHAN, )
SHAWN TOWNSEND, ALFRED DEMIRJIAN )
JOHN DOES 1-22, JOHN DOES SELLERS OF 1000ac. )
Of Connecticut Data Land to Plaintiffs 1-22, )
    Defendants )

FILED
IN CLERKS OFFICE
2022 DEC 27 PM 3: 09
U.S. DISTRICT COURT
DISTRICT OF MASS.

## COMPLAINT FOR DAMAGES AND RELIEF FROM RACKETEERING ENTERPRISE CONSPIRACY IN VIOLATION OF R.I.C.O. 18 U.S.C. 1962-1968 ss ET SEQ; SYSTEMIC PATTERN OF POLITICAL AND JUDICIAL CORRUPTION MALICIOUS PROSECUTION;

## OBSTRUCTION OF JUSTICE; WITNESS TAMPERING, VIOLATIONS OF CIVIL RIGHTS OF DUE PROCESS ELECTRONIC EAVESDROPPING CYBER SPYING - 42 U.S. CODE§ 1983-1 COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiffs Gotspace Data LLC, Ocean Development Partners LLC el al. and Nicholas Fiorillo. as manager, trustee , and individually the ("Plaintiffs") bring this instant complaint against NE EDGE, LLC, NSO GROUP TECHNOLOGIES LIMITED, TRACK VIEW TECHNOLOGIES, APPLE INC, T-MOBILE, INC et al (corporate defendants) Thomas Quinn, George Mclaughlin, Kevin Peters, Nicholas Nesgos, Michael Brier, Mathew Welnicki, Jeffery Hellman Peter Spitalny, Stuart Bornstein, Raymond C. Green, Samuel Spitalny, Brian Sheehan, Shawn Townsend, Alfred Demirjian, and others ("Enterprise Member Defendants"); City Of Boston, Boston Police Department, Mayor Michelle Wu, Individually, and as Mayor of the City of Boston, Kevin Hayden, individually and as District Attorney of Suffolk County, Boston Municipal Court, Officer Michael Powers, Detective Karl Dugal, Individually ("Judicial/Municipal Defendants") and in their official capacity, John Does 1-22, now known and unknown to the Plaintiffs at this time, John Does Sellers of 1000ac (the John Doe defendants) of "data site" land in Connecticut, a/k/a the Gotspace Data Digital Infrastructure Project.

This action is brought for the Defendants' systemic pattern of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C. § 1961 (c), 1962 (c), (d)et seq.)and (18 U.S.C. 1958(a)(b)(c)), 18 U.S. Code § 1951 - Interference with commerce by threats or violence addition to the ``Dodd-Frank Wall Street Reform and Consumer ... (9) in section 28 (12 U.S.C. 1831e)-- (A) in subsection (e)-- (i) in paragraph of United States , District Court of Massachusetts, and therefore venue is proper in this district and in this Court pursuant to 28 U.S.C. §1409(a). Defendants directly and/or indirectly engaged in the criminal wiretapping and/or sharing of illegally obtained, privileged and confidential information among associate-in-fact Defendants, and conspired to commit acts which enumerate at least 24 Federal causes of action: (1)18 U.S.C. §2511(2)(d), (2) Violations of 18 USC Ch. 96 - RICO Racketeering, (3) Violations of 18 U.S.C. §§ 891 to 896 - Loan Sharking, (4) Violations of 18 U.S.C. §873 - Extortion (5) Violations of 18 U.S.C. §1956 - Laundering of Monetary Instruments, (6)

Violations of 18 U.S.C. §1962 - Collection of Unlawful Debts and RICO Conspiracy, (7) Violations of the Privacy Act of 1974, (8) Fifth Amendment Violation - Loss of Property/Fear of Transfer, (9) Civil Rights Violation under 42 U.S.C. § 1985 - Conspiracy to Deprive, (10) First Amendment Violation - Freedom of Expression and (11) Malicious Prosecution under §1983  (12) Violations of Fifth Amendment Due Process Through Threats and Coercion, (13) Fourteenth Amendment Violation - Loss of Privilege, (14) Civil Rights Violations under 42 U.S.C. § 1983 - Discrimination, (15) Civil Rights Violations under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments - Threat to Loss of Liberty, (16) Violations of 18 USC 1801 - Patriot ACT, (17) Violations of the 1933 Act, (18) Violations Of The Federal Computer Fraud And Abuse Act 18 U.S.C. § 1030 (a-dd) (1-10), (19) Violations of the Federal Wiretap Act, (20) Violations of 124 Stat. 1376 - Dodd-Frank Wall Street Reform and Consumer Protection Act, (21) Violations of the American Anti-Corruption Act - AACA, (22) Violations of the Electronic Communications Privacy Act of 1986 (ECPA), (23) Violations of 34 U.S.C. § 12601), and (24) Violations of 28 U.S. Code §1983.

## THE CRIMINAL MODUS OPERANDI "M.O." OF THE NE EDGE RGPSQ RACKETEERING ENTERPRISE

1.        Plaintiffs allege that the Defendants, aka "The NE EDGE-RGPSQ Racketeering Enterprise," ("NE Edge Enterprise" or "Enterprise") have committed numerous violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C.§1961, 1962 (c)(d),et seq.) and (18 U.S.C. 1958(a)(b)(c)), 18 U.S.C §1964 (s,) 18 U.S. Code § 1951 - Interference with commerce by threats or violence in addition to numerous federal law claims of breach of loan, investment, extortion, loan shaking, wire tapping, electronic eaves dropping and unlawful vexatious debt collection activities. As the tactical objective of the NE Edge Enterprises has been to conspire to "frame up" Plaintiffs, Nicholas Fiorillo and his affiliate real estate and technology companies, by and through a sophisticated criminal "gas lighting grand corruption scheme" inside the Secret Courts of Massachusetts. By and through the NE Edge Enterprise's de facto attorneys' unclean hands and systemic judicial frauds on the courts. As they

"pull the strings" of certain Boston Police, Suffolk Superior, Boston Municipal, Orleans District  judicial "insiders" and other public officials and corrupted law enforcement to "frame-up" the Plaintiffs, in fictitious  financial crimes and the assault of Defendant Kevin Peters, that never took place.   These individuals formed a criminal group of defendants and attorney-defendants, and acting in concert, by conspiring, aiding and abetting each other, sought to usurp the Plaintiffs rights, title and interest in their valuable digital infrastructure development rights and intellectual property, institutional self-storage assets, commercial/residential  properties. This criminal group's efforts to loan-to-own their victims, through a pattern of fraud, obstruction of justice, malicious prosecution,  extortion, blackmail, wiretapping, cyber spying, data theft, threats of bodily harm and murder are unlawful. As part of the NE Edge Enterprises pattern of unlawful vexatious  debt collection activities culminating as a half dozen dubious inextricably connected debt collection lawsuits, across two different states and three judicial court systems, were and are wholly unlawful.

2.        In a series of highly sophisticated, complex, fraudulently-purported lending /investment schemes, Defendants set out to "loan to own" and "bait & switch," in order to usurp the plaintiffs' assets, real estate and digital infrastructure development business(s) and future development profits. The defendants' willful participation in the NE Edge Racketeering Enterprise, series of "malicious prosecution"  schemes and unlawful debt collection actions, with deliberacy and malice, orchestrated to deprive certain civil rights and freedoms, legal due process protections of the Plaintiffs, by an conspiring unlawfully to upend the judicial process by and through "pulling the strings" politically and judicially to decimate the plaintiffs legal rights and protections to defend against the  multiple debt collection lawsuits. All  designed to "loan to own" and  usurp bona fide ownership in real estate, digital infrastructure entitlement and development rights, and prior equitable monetary investment, constitute criminal acts. As plaintiffs  conduct their development business in the states of  Connecticut, Massachusetts, New Hampshire and Rhode Island, as well as in other states. The defendants live in the states of Georgia, New York, Ohio, Rhode Island,  Connecticut and Massachusetts, as well as abroad.

3.          These defendants have perpetrated a sophisticated racketeering conspiracy, to tortiously interfere with, derail, and block Plaintiffs' constitutional rights to due process of law and civil rights to due process to defend and protect their development efforts of the Gotspace New England Data Corridor . All of the Defendants, act as a criminal group, are attempting to extort and blackmail  the release of the Plaintiffs  federal claims against them to prevent the "loaning to own" of their Gotspace Data and Ocean real estate, development rights, entitlements and intellectual property, they have invested in substantially, and have worked diligently to obtain, from the State of Connecticut and certain local towns therein. Plaintiffs have received valuable municipal community host agreements, to construct and operate hyper scale data centers, pursuant to the Company's land purchase contracts with the John Doe Sellers. The NE Edge Enterprise Defendants' constant and relentless predatory  collection activities, have obstructed Plaintiffs' ability to develop their valuable  rights and title to their data campus sites and receive their specific state and local data tax incentive benefits. These are critical to Gotspace's project labor agreement commitments with the State's various labor and construction unions, for the development of Gotspace Data's Digital Infrastructure Master Plan of New England.

4.          It is irrefutable that this unlawful group of individuals, a.k.a. the NE EDGE-RGPSQ Enterprise, and its ring leaders, Thomas Quinn, Raymond Green, Peter Spitalny, Stuart Bornstein along with their co-conspirators, the RGSPQ attorneys, are without question a criminal group or "Enterprise," with a tactical understanding amongst its members, who continue to unlawful financially decimate and financially bankrupt the Plaintiffs, and their Gotspace Development Companies.  Defendants have made repeated unlawful attempts to abscond with all of the Plaintiffs intellectual property, real estate assets and exclusive rights to develop the Gotspace New England Data corridor, in clear violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) and have committed numerous other federal crimes against Plaintiffs.

5.          The Defendants' ongoing and unlawful racketeering conspiracy, was devised to strip the plaintiffs of rightful ownership of their existing $100,000,000 million dollar commercial, institutional

self-storage  and single family development portfolios. In addition,  Plaintiffs' share of the  future

development rights to upwards of $30,000,000,000.00 billion in hyper scale data center infrastructure and

equitable value creation that will be providing this regions digital  interconnectivity to the worlds' content

and data storage  providers and their investors  and  stockholders, which is all now at risk. Whereas the

sinister insurrection by NE Edge, to take control of and topple Gotspace Data by any means possible, and

attempts to usurp future control of the New England Data Corridor away from the Plaintiffs, is egregious

and unlawful. The NE Edge Enterprise's intentional and reckless manipulation, tortious interference and

multifaceted conspiracy against the plaintiffs within the secret courts of this state, focused on the

objectives to usurp Gotspace Data's exclusive and superior purchase contract rights, development rights,

and entitlements rights, and the Plaintiffs' potential for hundreds of millions of dollars in perpetual real

estate income and equity creation, for the company's stockholders.

6.       The defendants have conspired together to act in concert as a criminal group,

The "NE Edge-RGPSQ Enterprise," in tacit  agreement among its members, and with others, now known

and unknown to Plaintiffs,  traveled in, and caused another to travel in interstate commerce, with the

intent to usurp, embezzle, launder, extort and strip Plaintiffs' upwards of $10,500,000 in deposit and

investment monies, and derail the Gotspace Data purchase and development rights  intellectual property

they bargained for, when they entered into various contracts to purchase land, and other highly valuable

real estate.

7.       The " NE Edge-RGPSQ Enterprise" has committed numerous violations of federal laws, in

consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of

pecuniary value, specifically United States currency, as those terms are defined in Title 18, United States

Code, Section 1958(b), ss 924(c)(1) 18 U.S. Code § 1951 - Interference with commerce by threats or

violence. Plaintiff Nicholas Fiorillo is  in  constant fear of imminent bodily harm, unlawful arrest and

incarceration, as well as harm to his family, due to the violent threats by Defendants and their vexatious

judicial and political "insiders" influence to jail Plaintiff Nicholas Fiorillo, in  a sinister and corrupt

Boston Police, June 6th 2022 botched "sting", named "operation school house", where the NE Edge Enterprise used Mrs Fiorillo to "bait" and provoke Plaintiffs to commit an assault and battery against Defendant Kevin Peters, during a malicious prosecution and deposition of the Wife of the Plaintiffs, no such assault of Peters ever took place .

8.      Defendants, through their "investment lending" business dealings with one or more of the plaintiffs, ultimately made fraudulent claims in relation to the investment of capital for the benefit of the Plaintiffs  real estate holdings and development  businesses: Gotspace Data, Ocean Development Precinct 1 et al; Ocean Development et al; W-Lofts Development LLC and; BSI 254 Westfield St. LLC, et al.

9.      The NE Edge-RGSQ Enterprise has defrauded Plaintiffs, by fraudulently deceiving them into forfeiting rights and claims to preferred stock, and equities  of the plaintiffs' companies, and investments and bonafide equitable ownership, and future development rights, to Gotspace Data et al, Ocean Development et al, Gotspace Development et al, W-Lofts Development LLC, and BSI 254 Westfield St. LLC, et al.. All of this was put into motion by way of an exchange for a promise by Defendants to Plaintiffs, of access to the necessary capital required to complete their acquisition and future development objectives. Under a "smoke and mirrors" joint venture partnership with Defendants, additional fraudulent schemes were systematically "presented" to the plaintiffs. After a critical, so-called "partnership" formation which ultimately turned out to be a set up, Defendants continued to offer promises of "future" capital to the plaintiffs, always with a quid pro quo demand for additional stock, in the plaintiffs' development companies and real estate holdings, as well as cash which was otherwise not due or owing to them. (Exhibit A)

10.     Defendants never had any intent of honoring their representations to meet capital investment requirements, yet the partnership continued on, with bad-faith negotiations of multiple misrepresented loan agreements and fraudulent extortionist extension agreements, which Plaintiffs were always presented with at "the last minute," timed on the eve of foreclosure(s), default notice(s), and brink of financial ruin. Plaintiff Nicholas Fiorillo and his family were always under extreme financial duress,

fearful of being financially ruined and on multiple occasions. They have been unlawfully threatened with being prosecuted criminally for "crimes" they did not commit and threatened with physical harm and even death.

11.     By virtue of these predicate Racketeering Acts, Defendants have committed federal crimes deemed gross financial negligence at best, and outright fraud in reality. These individuals knowingly proffered deceptive loan documents, only to prematurely demand repayment, at sometimes as much as 1500%, including demand for stock, real estate and cash which was not due or owing. Through their Racketeering schemes to  "loan to own" RICO Enterprise, all of the Defendants have continued to tortiously interfere with the Plaintiffs ongoing businesses, future development projects, and rights to upwards of $30,000,000,000 billion in development and perpetual development profits. Defendants maintain tactical control of the NE Edge-RGPSQ Enterprise, through their willful participation with the RGPSQ Attorney Defendants, in unlawful and concerted "loan shark attacks," and then commencing a series of unlawful, fraudulent, debt collection lawsuits. This Racketeering Enterprise routinely obstructs justice, engages in wiretaps, witness tampering and extortionist extensions of credit, followed by predatory collection of fraudulent credit loans, in violation of Federal Law. "The RGSQ Racketeering Enterprise" continues to commit numerous violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C.§1961, 1962 (c)(d),et seq.) and (18 U.S.C. 1958(a)(b)(c)), 18 U.S.C §1964 (s,) 18 U.S. Code § 1951, including but not limited to interference with commerce by threats or violence, in addition to a multitude of federal law claims, for breach of loan, money laundering and wire frauds.

Now come the plaintiffs and state as follows:

<u>**NATURE OF THIS CASE**</u>

12.     This case involves a network of associates in fact, including convicted felons,  loan sharks, current suspects in inextricably related ongoing criminal investigations of some or all of the enterprise defendants and rogue law enforcement officers. Who employ patterns of criminal activity and campaigns

of misinformation to target the Plaintiffs legitimate companies and individuals with fabricated claims of purported misconduct in their sinister "deep fake" sophisticated misdirection, which continues in inflicting millions of dollars in damage. The criminal "cyber hacking" network hereinafter referred to as the NE Edge-RGPSQ NSO-Westbridge Technologies, Trackview, Apple Inc and T-Mobile, is the digital terrorist faction of the NE Edge  Enterprise (the "Enterprise") engaged in a pattern of criminal cyber spying and other misconduct which includes but is not limited to (i) defrauding Plaintiff with bogus claims of delinquencies on "legitimate" investment notes; (ii)loan sharking schemes; (iii) intentional and malicious interference with Plaintiff's business relationships; and (iv) threats of violence and extortion and "kickback" schemes and; (v) Cyberattacks/data breaches and theft of intellectual property  by and through the Defendants cyber spying  conspiracy, aiding and abetting, deployment and 1000s of systemic targeted cyber attacks. Against  the Plaintiffs electronic Apple iOS communication devices and laptops operating on the various Apple  operating systems, provided, policed and controlled by and through Apple Inc highly encrypted user applications. Whereas the Apple Inc and T-Mobile, Inc  defendants failure to protect the  Plaintiffs from the  unlawful cyber attacks of the other defendants, by enabling hosting, harboring, and systemic cyber phishing by the NSO/Westbridge Trackview T-Mobile defendants, "infiltration" of the Plaintiffs Apple Inc ios operating systems, enabling the Pegasus  spyware to digital violate and decimate the Plaintiffs rights to privacy and confidentiality  by the unclean hands of the enterprise and the corporate cyber defendants.

13.    These cyber defendants all willfully participated in or conspired with the NE Edge Racketeering Enterprise's series of "loan to own" schemes and unlawful debt collection actions with deliberacy and malice. These patterned schemes, orchestrated to deprive certain interests of the Plaintiffs through perpetration of unlawful, predatory collection activities, were designed to usurp bonafide ownership in real estate, digital infrastructure entitlement and development rights, and prior equitable monetary investment. The subject matter of their lawsuit includes that which "constitutes a claim of a right or title real property or the use and occupation thereof."

14.     It is irrefutable that this unlawful group of individuals and their ring leaders, Thomas Quinn Raymond Green, Peter Spitalny, Stuart Bornstein and  George Mclaughlin, along with their co-conspirators, the Enterprise attorneys, are without question a criminal group or  with a tactical understanding amongst its members, who continue to unlawful financially decimate and financially bankrupt the Plaintiffs, and their Gotspace Development Companies.

15.     Defendants have made repeated unlawful attempts to abscond with all of the Plaintiffs intellectual property, real estate assets and exclusive rights to develop the Gotspace New England Data corridor, in clear multiple violations of the Racketeer Influenced And Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) and have committed numerous other federal crimes against Plaintiffs.

16.     The Defendants' ongoing and unlawful racketeering conspiracy, was devised to strip the plaintiffs of rightful ownership of their existing $100,000,000 million dollar real estate portfolio and loan to own the Gotspace Data Company and the Plaintiffs' future rights to upwards of $30,000,000,000.00 billion  in hyper scale data center development, operation and  value creation, through their utility and storage of the worlds' content and data needs for their private stockholders.

17.     The sinister insurrection by this criminal Enterprise, to take control of the Plaintiff's data storage development opportunities and usurp future control of the New England Data Corridor away from the Plaintiffs, is egregious and unlawful. The Enterprise's intentional and reckless manipulation, tortious interference and multifaceted deep state conspiracy against the plaintiffs, focused on the objectives to usurp Gotspace Data's exclusive and superior purchase contract rights, development rights, and entitlements rights, and the Plaintiffs' potential for hundreds of millions of dollars in perpetual real estate income and equity creation, for the company's stockholders.

18.     Defendants Raymond Green, along with Samuel and Peter and Spitalny and the other defendants, have been working with a group of attorneys including fellow defendants Kevin Peters, Nicholas Nesgos and George Mclaughlin, utilizing their contacts within states judicial court systems and the Boston Police,  to collect unlawful debts and maliciously prosecute the Plaintiffs and wrongfully

criminally charged and extort a favorable outcome of settlement and release of claims for their own self betterment. Their Modus Operandi (MO) has been to intimidate, harass, "frame up" position the direction of their debt collection activities unlawfully, through the Massachusetts court systems by and through a systemic pattern of unlawful prosecution and judicial and political corruption schemes. Plaintiff Nicholas Fiorillo and his development companies, never stood a chance to have their civil rights to a fair and just hearing upheld in the lower courts, and each of the Federal violations set forth within this Complaint must be remedied for the benefit of our basic rights to due process of law and civil liberties afforded to all Americans, found under the United States Constitution of America.

19.    Nicholas Fiorillo, along with his immediate family and his business associates have been victimized, cornered and "cyber spied" into a series of disadvantageous legal positions by these Enterprise and the judicial and municipal defendants. This group has clearly, through their various political and judicial "insider" connections, manipulated the Boston Municipal Court (Boston, MA.), Suffolk County District Court (Boston, MA.), the Barnstable County District Court (Barnstable, MA.), the Orleans District Court (Orleans, Ma.) and the Boston Police as well as the U.S. Federal Bankruptcy Court (Boston, Ma.).

20.    The Plaintiffs have been systematically denied their civil rights in the lower courts where there is no remedy, recourse and redress against the despicable, systemic pattern of Grand Corruption within the secret courts of the Commonwealth. This criminal Enterprise's pattern of fraud, extortion, blackmail, wiretapping, threats of bodily harm and murder, as part of a pattern of unlawful activities culminating across two different states and three judicial court systems, are wholly unlawful.

21.    Plaintiffs have sustained significant financial damages, loss of real estate, intellectual property and physical and emotional damages and duress due to an ongoing pattern of fraudulent racketeering conduct by NE Edge RGPSQ members and their racketeering attorneys, led by Nicholas Nesgos, George Mclaughlin, Kevin Peters, Mathew Welnikki and Jeffery Hellman. At the direction of Thomas Quinn, Raymond C. Green, Peter Spitalny and other NE Edge members that are aided and

abetted by individuals including but not limited to: Samuel Spitalny,  the NSO Group, Trackview, Apple Inc., T-Mobile the Boston Secret Court Judicial Insiders, the Boston Police Detectives Karl Dugal and Michael Powers, Brian Sheehan, Shawn Townsend, Stuart Bornstein and Enterprise attorneys George Mclaughlin, Kevin Peters, Nicholas Nesgos, and Jeffrey Hellman,  John Does 1-22,  John Doe Sellers and other enterprise  members know and unknown to the Plaintiffs at this time.

## PARTIES

22.     The Plaintiff, Gotspace Data LLC ("Gotspace"), is a Massachusetts Corporation with a registered mailing address of 268 Newbury St., 4th Floor, Boston, MA, 02116.

23.     The Plaintiff, Ocean Development Partners, LLC ("Ocean"), is a Rhode Island Corporation with a registered mailing address of 130 Dorrance St Providence RI, 02903.

24.     The Plaintiff Gotspace Development, LLC, is a Massachusetts Corporation with a registered mailing address of 268 Newbury St., 4th Floor, Boston, MA, 02116.

25.     The Plaintiff Ocean Development Partners Precinct I, LLC, is a Massachusetts Corporation with a registered mailing address of 268 Newbury St., 4th Floor, Boston, MA, 02116.

26.     The Plaintiff Ocean Vacations Realty Trust, LLC, is a Massachusetts Corporation with a registered mailing address of 268 Newbury St., 4th Floor, Boston, MA, 02116.

27.      The Plaintiff Nicholas Fiorillo, Trustee, is a duly appointed trustee of Ocean Vacations Realty Trust, and a resident of the Commonwealth with an address of 3 Kales Way, Harwich Port, MA, 02646.

28.     The Plaintiff Nicholas Fiorillo, is an individual with an address of 3 Kales Way, Harwich Port, MA, 02646.

29.     The Defendant, NE EDGE, LLC, is a Massachusetts Limited Liability Company, with a principal office address of  54 Claremont Road, Belmont, MA, 02478.

29. a.  The Defendant, All Of Us At North, LLC, is a Massachusetts Limited Liability Company, with a principal place of business at 297 North Street, Hyannis, MA 02601.

29. b.   The Defendant, Verde Group, LLC is a Connecticut Limited Liability Company, with a business address of 150 Trumbull Street, 5th Fl., Hartford, CT, 06103.

29 c.   The Defendant, Route 44 Development, LLC, is a Massachusetts Limited Liability Company, with a principal place of business at 500 Harrison Ave., Suite 4R, c/o Charter Environmental, Inc., Boston, MA, 02118.

29 d.   The Defendant, Rising Tides, LLC, is a Limited Liability Company, with a principal place of business not known to Plaintiffs at the time of filing.

29 e.   The Defendant, Crowd Lending, LLC, is a Massachusetts Limited Liability Company, with a principal place of business at 218 Willard St Suite 301, Quincy, MA 02169.

29 f.   The Defendant, Daniel Najarian, is an individual with a principal place of business at 218 Willard St Suite 301, Quincy, MA 02169.

29. g.   The Defendant, Daniel Mclaughlin, is an individual with a principal place of business at 54 Claremont Road, Belmont, MA, 02478.

30.   The Defendant, NSO Group Technologies Limited, is an Israeli limited liability company with a principal office location in Herzliya, Israel, and is subject to the jurisdiction of this Court. Upon information and belief, NSO is a subsidiary of Q Cyber, and designs, develops, and manufactures highly invasive surveillance technology or spyware and related products and services, including the Pegasus spyware.

31   The Defendant, Westbridge Technologies, is a Delaware Limited Liability Company, with a principal office address of 6701 Democracy Blvd., Suite 300, Bethesda, MD 20817.

32.   The Defendant, Apple, Inc., is a California corporation established in 1976, with its principal place of business in Cupertino, California.

33.   The Defendant, T-Mobile Inc., is a California corporation established in 1976, with its principal place of business in Cupertino, California.

34.     The Defendant, GF Funding, is a Massachusetts Limited Liability Company, with a principal office address of 54 Claremont Road, Belmont, MA, 02478.

35.     The Defendant, Stein Fibers, is a Company with a principal office address of 4 Computer Drive, Albany, New York, 12205, and also operates in North Carolina.

36.     The Defendant Blue Vista Capital, is a Delaware Corporation with principal operations at 254 Clark Street, Ste. 730, Chicago, IL 60654.

37.     The Defendant, BSI 254 Westfield, LLC, has as its Registered Agent, Eric Everett, of Darrow Everett, 50 Congress Street, Ste. 1040, Boston, MA 02109.

38.     The Defendant, W-Lofts, LLC, is a Rhode Island Limited Liability Company, with a service of process address at 268 Newbury St., 4th Floor, Boston, MA, 02116.

39.     The Defendant, S&Q Data, LLC, is a Rhode Island limited liability company, with a service of process address at 268 Newbury St., 4th Floor, Boston, MA, 02116.

40.     The Defendant, S & J Storage Bros. LLC, is a Rhode Island limited liability company, with a service of process address at 268 Newbury St., 4th Floor, Boston, MA, 02116.

41.     The Defendant, City of Boston, is a municipal corporation created under the laws of the Commonwealth of Massachusetts and at all relevant times hereto, employed the defendants Officer Michael Powers and Detective Karl Dugal.

42.     The Defendant Boston Police Department, is a law enforcement entity created under the laws of the Commonwealth of Massachusetts with a primary location at 1 Schroeder Plaza, Boston, MA 02120.

43.     The Defendant Boston Municipal Court, is a Court of the Commonwealth of Massachusetts, with a principal location at 24 New Chardon Street, Boston, MA 02114.

44.     The Defendant, Mayor Michelle Wu, is and was at all times relevant, the Mayor of the City of Boston. As such, she is responsible for the overall training and conduct of the Boston Police Department. She is named individually and in her official capacity.

45.     The Defendant, Kevin Hayden, is the District Attorney of the County of Suffolk, State of Massachusetts. He is named individually and in his official capacity.

46.     The Defendant, Police Officer Michael Powers, at all times relevant hereto was a duly appointed officer of the Boston Police Department and a resident of the Commonwealth of Massachusetts. He is named individually.

47.     The Defendant, Detective Karl Dugal, at all times relevant hereto was a duly appointed officer of the Boston Police Department and a resident of the Commonwealth of Massachusetts. He is named individually.

48.     The Defendants Michael Powers, Karl Dugal and Mayor Michelle Wu, were acting under color of state law and pursuant to their authority as police officers and Mayor of the City of Boston, in all actions alleged in this complaint.

49.     The Defendant, Kevin T. Peters, is an individual residing in Boston, County of Suffolk, State of Massachusetts, with a principal place of business at 40 Broad Street, Boston, MA 02109.

50.     The Defendant, Raymond C. Green, is an individual residing in Boston, County of Suffolk, State of Massachusetts, with a principal business address of 155 Federal Street, Boston, MA 02110.

51.     The Defendant, Peter Spitalny, is an individual residing at 14 Pheasant Lane, Albany, NY, 12204.

52.     The Defendant, Samuel B. Spitalny, is an individual residing at 505 Overbrook Drive, NW, Atlanta, Georgia 30318.

53.     The Defendant, Thomas Quinn (Quinn), is an individual residing at 426 Love Lane, East Greenwich, CT 02818.

54.     The Defendant, George Mclaughlin ("Mclaughlin"), is an individual residing at  54 Claremont Road, Belmont MA, 02478.

55.     The Defendant, Nicholas Nesgos ("Nesgos"), is an individual with a principal place of business at 80 Boylston Street, 32nd Floor, Boston, MA 02109.

56.     The Defendant, Stuart Bornstein, is an individual with a principal place of business at 297 North Street, Hyannis, MA 02601.

57.     The Defendant, Jeffrey Hellman ("Hellman"), is an individual with a principal place of business at 195 Church Street, 10th Floor, New Haven, CT 06570.

58.     The Defendant, Brian Sheehan ("Sheehan"), is an individual residing at 296 Mason Terrace, Brookline, MA 02446.

59.     The Defendant, Shawn Townsend (Townsend), is an individual with principal operations at 254 Clark Street, Ste. 730, Chicago, IL 60654.

60.     The Defendant, Alfred Demirjian, is an individual with a principal place of business at 87 Blanchard Road, Floor 2, Cambridge, MA 02138.

61.     Upon information and belief, John and Jane Does are officers of the Boston Police Department, members of the Boston Municipal Court, Suffolk District Attorneys' Office, and others.

62.      Upon information and belief, Defendants John Doe Corporations 1 through 22 (the "Corporate Defendants") are corporations, the names and addresses of residences of which are either unknown, or included on the list appended hereto by Exhibit, to be more specifically named as confirmation is further obtained.

**JURISDICTION**

63.     This action is brought under 42 U.S.C. § 1983 and the Fourth, Fifth, Eighth and Fourteenth amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

64.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as the cause of action arises under federal statute, to wit, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

65.     The United States Code of federal proceedings arising in or related to cases under such the United States Code, and this proceeding may be commenced and prosecuted in the District Court of Massachusetts. This matter is a core proceeding as defined in 28 U.S.C. §157(b)(2)(H), and is brought pursuant 18 U.S.C. §1964(c).

66.     The Court has personal jurisdiction over corporate Defendants because they operate in the United States, have obtained financing and investments from corporate America, have US based business interests, aka NSO-Westbridge technologies the sales arm of North America, who have directed and targeted their "cyber spying" actions at U.S. consumers who purchase goods and services from U.S. businesses, like Apple Inc. In addition, the claims in this Complaint arise from Defendants' actions in Massachusetts, tortious conduct directed at and causing harm in Massachusetts, and systematic and continuous contact with Massachusetts, including NSO, Trackview, Apple's and T-Mobile, the tech Defendants', unlawful cyber spying, unlawful infiltration and cyber phishing and 700 million megabytes of data and use of Fiorillo's Apple account, which is maintained on servers located in Massachusetts.

67.     Moreover, NSO Defendants' malicious and harmful activities brought them well within the long arm of the law and the jurisdiction of this Court, which has the authority to hold them to account for their violations of U.S. federal and Massachusetts laws and for the damages they have inflicted on Plaintiffs.

68.     NSO Defendants design, develop, manufacture, market, distribute, and operate various surveillance technology, including malware, spyware, and other hacking devices designed to secretly intercept and extract information and communications from mobile phones and electronic devices. NSO Defendants' products included a highly invasive spyware known as "Pegasus," which NSO describes as "a world-leading cyber intelligence solution that enables the end user to remotely and covertly extract valuable intelligence from virtually any mobile device."

## NE EDGE-RGPSQ ELECTRONIC WIRETAP AND DIGITAL CYBER PHISHING LOAN TO OWN IMPACT STATEMENT

69.     The Enterprise, led by Raymomd Green and Peter Spitalny George Mclaughlin, Nicholas Nesgos and Kevin Peters, with tactical assistance of cyber spy Alfred Demirjian, utilized this sophisticated digital surveillance software and related equipment to wiretap his electronic devices and spy on him, his family and his business associates, starting as far back as December 2020, actively

distributing the Fiorillo's private and confidential information amongst the other members of the Enterprise.

70.     The Enterprise's ongoing wiretaps enabled their egregious pattern of intimidation, obstruction of justice and unlawful eavesdropping, motivated by a desire to financially destroy and silence the Fiorillos. These defendants have broken numerous Federal and State laws in their relentless and unlawful pursuit of Fiorillo's assets and business interests.

71.     Defendants Blue Vista, Townsend and Sheehan, intentionally misrepresented to Plaintiff Nicholas Fiorillo over a period of 18 months, their ability to quickly obtain loan commitments for upwards of $150,000,000, from Blue Vista and Sheehan's Capstack Mortgage Brokerage Company, for the entire first phase of the data development project.

72.     These defendants intentionally steered Fiorillo right into their predatory lending trap, with a continued pattern of fraudulent representation of loan commitments, and the promised certainty that "big money" was always just four to six weeks away, was used as additional "bait," to induce Fiorillo, in detrimental reliance, to turn over ownership shares of his Company's Gotspace Data Equity Fund, and upwards of 300% interest returns, to the Defendants.

73.     The pattern of fraudulent manipulation from Fiorillo's so-called "commercial mortgage brokers," Sheehan and Townsend, and the rest of the Enterprise defendants, was clearly predatory in nature, and Plaintiff was ultimately and purposefully placed under financial duress and on the verge of financial ruin.

74.     With no other choice but to either agree to usurious "loan" terms, or lose the $1,000,000 he had already invested into his Company,  on or about February 15, 2021, Peter Spitalny and the other Defendants, on behalf of Stein Fibers, "bait and switched" Fiorillo into executing predatory loan agreements, then effectuated a series of interstate wire transfers from various entities and investment accounts, into Fiorillo's Gotspace Development's operating account.

75.     The Enterprise's predatory, loan-to-own financing schemes, breach of loan agreements and

inter-credit capital agreement breaches with Plaintiff Nicholas Fiorillo, have continued to cost him substantial, quantifiable financial damages, well into the hundreds of millions of dollars. Their sinister undermining, political indulging, and unlawful, multi-faceted, deep three state conspiracy against the plaintiffs, have tortiously interfered with what could be well over 3,000 construction jobs, and upwards of 5,000 additional jobs for the State of Connecticut and New England in general, from coming to fruition.

76.    Defendants were out to take control of Gotspace Data away from Nicholas Fiorillo by any means possible, including unlawful prosecution of debt collections, grand judicial corruption schemes in violation of 18 U.S. Code § 1951 - Interference with commerce by threats or violence in addition to numerous federal law claims of breach of loan, investments, contracts.

77.    Enterprise defendants, did knowingly conspire to defraud, usurp, tortiously interfere with and extort monies and property from, the plaintiffs' Gotspace Development et al, Ocean Development et al, W-Lofts Development LLC, BSI 254 Westfield St LLC, and others. Some, if not all of these defendants are guilty of fraudulent and unlawful wiretapping and data breach crimes, and have engaged in both actionable cyber and electronic civil and criminal conduct against the plaintiffs, which are stated in this instant action.

78.    Defendants committed numerous violations of federal laws wiretap laws, in consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, specifically United States currency, as those terms are defined in Title 18, United States Code, Section 1958(b), ss 924(c)(1) 18 U.S. Code § 1951 - Interference with commerce by threats or violence. Plaintiff Nicholas Fiorillo is still in fear of imminent bodily harm as well as harm to his family, due to the violent threats by Defendants.

79.    The Enterprise defendants have defrauded Plaintiff, by fraudulently deceiving them into forfeiting property rights and claims to preferred stock and equities of the plaintiffs' companies, investments, bonafide equitable ownership, and future development rights, to Plaintiff's companies Gotspace Data et al, Ocean Development et al, Gotspace Development et al, W-Lofts Development LLC,

and BSI 254 Westfield St. LLC, et al. with the uses of unlawful digital cyber hacking technology.

80.     All of this was put into motion by way of an exchange for a promise by Defendants to Plaintiffs, of access to the necessary capital required to complete their acquisition and future development objectives. Under a "smoke and mirrors" joint venture partnership with Defendants, additional fraudulent schemes were systematically "presented" to Nicholas Fiorillo artificed to "bait and switch" the plaintiffs under duress and financial ruin into disadvantageous minority partnerships and loss of control positions.

81.     After "last minute", so-called "partnership" formation which ultimately turned out to be a sham real estate loan closings set up, to "loan to own" all the benefits of the Plaintiffs development projects.  Defendants would continue to offer promises of "future" capital to the plaintiffs if they "just closed the loan', always with a quid pro quo demand for additional stock, in the plaintiffs' development companies and real estate holdings as the Defendants would always "change the deal" at the last minute, leaving the  Plaintiffs no choice but to give up control and ownership interests , as well as millions in development profits  which was otherwise not due or owing to the Defendants.

82.     Defendant McLaughlin's usurping of interest in the Plaintiffs Swansea Mall development prompted formation of a series of "shill corporations"  NE Edge LLC, a "fence"  behind which the Defendants could then use to go after the Plaintiffs digital infrastructure project in Connecticut. As attorneys Mclaughlin, Peters, Nesgos and others could attempt to usurp Plaintiff's Gotspace Data Sites, as well as  other properties, GS Beverly, GS Gloucester, W-Lofts, and BSI 254 Westfield Street away from the plaintiffs unlawfully.

83.     All of the Defendants stand to benefit financially, if the Plaintiff was to be dispossessed of his business ownership interests, which would then allow the enterprise Defendants and    Peters, Mclaughlin and the other attorney defendants, to collect millions in unlawful legal fees, increase their personal stakes in the assets of the plaintiff's through hybrid recovery contingency legal fee agreements. Accordingly, all of the attorney-defendants effectively have a personal interest in the entire nexus of vexatious unlawful debt collection litigation, being perpetrated against the Plaintiffs.

84.     From September of 2021 up until this day, the Enterprise defendant attorneys have engaged in cyber spying conduct, which has not only inflicted undue duress upon Plaintiff Nicholas Fiorillo and his wife, but has included extreme acts of assault, physical battery, and intimidation, extortion, loan shaking electronic eavesdropping, cyber hacking  unlawful prosecution of crimes and collection  of debts not due or owing. Whereas such unlawful loan sharking activities and unlawful "frame-ups" of the Plaintiffs, by the defendants Boston Police, Detectives Powers and Dugal, District Attorney Hayden by and through the SSC/BMC courts and the City of Boston,  directly caused Mrs. Fiorillo to have a cardiac episode which hospitalized and nearly killed her. Plaintiffs and their family are clearly the prey of these Racketeering members and  International  cyber criminal outfits. Whom continue to aid, abet and conspire with the other Defendants, in their illegal "loan-to-own-unlawful prosecution" schemes to gain control to the Gotspace Data Master Development of the New England Data Corridor and the billions of dollars in potential profits not due or owing the NE Edge/RGPSQ Criminal Enterprise or its members.

85.     The Enterprise Defendants Samuel Spitalny and Kevin Peters, continue to conspire Alferd Disarjiarian and other   highly sophisticated John doe artificial intelligence experts, consultants  and the defendants' cyber spying group NSO, Westbridge, Trackview by and through  Apple Inc and T-Mobile, Inc, plaintiffs service and use provider relationships  and these defendants failure to prevent, protect, police a systemic failure to protect the Plaintiffs from the defendants  "cyber hacking" and data breaches on the all the Plaintiffs digital devices. As the NE Edge attorneys continue to electronically "eavesdrop" with the enterprises covert  "spyware apps" on Fiorillo, his family, counsel, gotspace data, Ocean development businesses and  associates. All  over  the  past  two  years,  with  thousands  of "digital-ping-wire-taps" on phone, email and electronic communications, which Attorney Kevin Peters and Samuel Spitalny, with the tactical assistance of Alfred Demirjian, have intercepted "over the air," with the NSO-Trackview Pegasus spying apps from their extensive   cyber phishing "burner phone(s)/laptop(s) network" in Boston, Albany, New Jersey and Atlanta with the Pegasus based cyber spying technology. This highly sophisticated and  digitally advanced "all spying, all gps tracking, all data

breaching" spyware technology being utilized by the defendants against the Plaintiffs is considered one of the most powerful 'cyber weapons" on earth that has is being used to forward United States terrorist groups, acts of international treason, to control and suppress information from the populations of the world, spy on its citizens and often spread communist based propaganda.

86. The Enterprise's electronic eavesdropping and "cyber-geo-location-pings," have put Nicholas Fiorillo in fear for his and his family's safety. Threats on his life and his family's safety have been constant with members of the Enterprise attacking, breaking and entering, assaulting and also systemically extorting the Plaintiffs by the Enterprise attorneys, which have been reported by Fiorillo to the local and Federal authorities, judicial oversight tribunals and boards of professional licensure to no avail.

87. This unlawfully obtained "cyber hacked" data and confidential and privileged communications stolen from the Plaintiffs have given defendants and their attorneys an unfair and sinister legal advantage over Nicholas Fiorillo, in all aspects of the legal process and law enforcement "frame-ups". Whereby the Plaintiffs legal filings have no effect nor ever receive a fair and non-prejudicial analysis nor fair or equitable due process of law. As the continued threats against the Plaintiffs life and liberties and actual freedom from incarceration, always have unsolicited extortionist settlement offers to turn over and pay up and turn over upwards if $100,000,000 in real estate, intellectual property and cash, were always perfectly timed and positioned with specific threats on life and financial ruin, judicial doom and gloom and defaults which always would coincided with Fiorillo's privileged and confidential legal communications with his legal counsel and the over 6 unlawful "loan shark suits" that have been brought against the Plaintiffs unlawfully and maliciously, such predatory debt collection actions have been all inextricably vexatious lawsuits have been artificed to collect unlawful debts in violation of racketeering and loan sharking protections.

88. This ongoing pattern to interfere with attorney-client privileged communications through illegal "wiretaps," continue to aid and abet the Enterprise's criminal activities, and give an unfair legal

advantage to their attorneys, as they willfully conspire to gain unfair legal advantage against Nicholas Fiorillo and his legal team, in courtroom proceedings amounting to little more than illegal debt collection. All in violation of 18 U.S. Code § 2511, the interception and sharing of wire, oral, or electronic communications is unlawful, under the Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C. § 1961 (c),  1962 (c), (d)et seq.)and (18 U.S.C. 1958(a)(b)(c)), 18 U.S. Code § 1951 - Interference with commerce by threats or violence in  addition to the ``Dodd-Frank Wall Street Reform and Consumer ... (9) in addition to section 28 (12 U.S.C. 1831e)-- (A) in subsection (e)-- (i) in paragraph of United States. Therefore, venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

89.    This case involves nefarious individuals, associates in fact, including convicted felons and loan sharks, nefarious cyber criminals, and complacent national big tech companies and wireless service providers, Apple Inc and T-Mobile, Inc.. The Boston Police, Detectives Powers and Dugal, rogue law enforcement officers and politically corrupt judicial "insiders" and highly sophisticated foreign national Israeli criminal cyber spying organization NSO and their USA based Westbridge Technologies and Sanfransico based Trackview.  Whom have  employed patterns of criminal activity, electronic cyber hacking,  and campaigns of misinformation, unlawful criminal prosecutions, "frame ups" and cyber data breaching  to target legitimate companies and individuals to "sell" a deep fake fictitious claim of purported financial misconduct and deep state "falsified and baseless" criminal investigations, inflicting billions  of dollars in damage to their Victims.

90.    The criminal network hereinafter referred to as the NE EDGE-RGPSQ Enterprise (the "NE Edge Enterprise") engaged in a pattern of criminal loan sharking and other financial misconduct which includes but is not limited to (i) defrauding Plaintiff with claims of delinquencies on "legitimate" investment notes; (ii) cyberattacks; (iii) intentional and malicious interference with Plaintiff's business relationships; and (iv) threats of violence and murder, (v) extortion of property and trade secrets; and (vi) money laundering and many other federal crimes.

91.     The defendants all willfully participated in or conspired with the NE Edge Racketeering Enterprise's series of "loan to own" schemes, financial embezzlement schemes,  and unlawful debt collection actions with deliberacy and malice. These patterned schemes, orchestrated to deprive certain interests of the Plaintiffs through perpetration of unlawful, predatory collection activities fraudulent investment contracts, were designed to usurp bonafide ownership in real estate, digital infrastructure entitlement and development rights, and prior equitable monetary investment, as patterned loan to own scheme.

92.     Defendants directly and/or indirectly engaged in the criminal wiretapping and/or sharing of illegally obtained, privileged and confidential information among associate-in-fact Defendants, and conspired to commit acts which enumerate at Federal causes of action: (1) Violations Of The Federal Computer Fraud And Abuse Act 18 U.S.C. § 1030 (a-dd) (1-10), (2) Violations of the Federal Wiretap Act, 18 U.S.C. §2511(2)(d), (3) Violations of 18 USC Ch. 96 - RICO Racketeering, (4) Violations of the Privacy Act of 1974, (5) Fifth Amendment Violation - Loss of Property/Fear of Transfer, (6) Civil Rights Violation under 42 U.S.C. § 1985 - Conspiracy to Deprive, (7) First Amendment Violation - Freedom of Expression and (8) Malicious Prosecution under §1983 (9) Violations of 18 U.S.C. §§ 891 to 896 Violations of the American Anti-Corruption Act - AACA, (21) Violations of the Electronic Communications Privacy Act of 1986 (ECPA), (22) Violations of 18 U.S.C. §§ 241, 242, (23) Violations of 34 U.S.C. § 12601), and (24) Violations of 28 U.S. Code § 455.

93.     It is irrefutable that this unlawful group of individuals and their ringleaders, Thomas Quinn, George Mclaughlin Raymond Green, Peter Spitalny, and Stuart Bornstein, along with their co-conspirators, the Enterprise attorneys, are without question a criminal group with a tactical understanding amongst its members, who continue to unlawful financially decimate and attempt to unlawfully financially bankrupt the Plaintiffs, and their Gotspace and Ocean Development Companies.

94.     Defendants have made repeated unlawful attempts to abscond with all of the Plaintiffs' intellectual property, real estate purchase contracts and assets and exclusive rights to develop the

Gotspace New England Data corridor, in clear multiple violations of the Racketeer Influenced And Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) and have committed numerous other federal crimes against Plaintiffs.

95.    The Defendants' ongoing and unlawful racketeering conspiracy, was devised to strip the plaintiffs of rightful ownership of their existing $100,000,000 million dollar real estate portfolio and loan to own the Gotspace Data Company and the Plaintiffs' future rights to upwards of $30,000,000,000.00 billion in hyper scale data center development, operation and  value creation, through their utility and storage of the worlds' content and data needs for their private stockholders.

96.    The sinister insurrection by this criminal Enterprise, to take control of the Plaintiff's traditional and data storage development opportunities and usurp future control of the Gotspace New England Data Corridor away from the Plaintiffs, is egregious and unlawful. The Enterprise's intentional and reckless manipulation, tortious interference and multifaceted deep state conspiracy against the plaintiffs, focused on the objectives to usurp Gotspace Data's exclusive and superior purchase contract rights, development rights, and entitlements rights, and the Plaintiffs' potential for billions  of dollars in perpetual real estate income and equity creation, for the company's stockholders.

97.    Defendants Raymond Green, Thomas Quinn and George Mclaughlin, along with Samuel and Peter and Spitalny, have been working with a group of attorneys including fellow defendants Kevin Peters, and Nicholas Nesgos, and utilizing their politically corrupt control and powers over the  various court systems, to collect unlawful debts and conduct other nefarious acts for their own self betterment. Their Modus Operandi (MO) has been to intimidate, harass, assault battery, frame up and conspire to position the direction of their debt collection activities unlawfully, through the court system.

98.    Plaintiff Nicholas Fiorillo never stood a chance to have his civil rights to a fair and just hearing upheld in the lower courts, and each of the Federal violations set forth within this Complaint must be remedied for the benefit of the basic rights and civil liberties afforded to all Americans, found under the United States Constitution of America.

99.    Plaintiffs plead with this court for relief from ongoing actual and proximate damages due to the Defendants ongoing pattern of racketeering acts unlawfully perpetrated by Defendants and their attorneys, aka "The RGPSQ Racketeering Enterprise" ("RGPSQ"). Led by Raymond C. Green, Peter Spitalny, George Mclaughlin, Stuart Bornstein and Thomas Quinn, aided and abetted by other members of this criminal group, including but not limited to: Samuel Spitalny, Jacob Spitalny, Brian Sheehan, Shawn Townsend, Joan Green, Christopher Regean, Stephen Quillinan, and Enterprise attorneys Kevin Peters, Michael Brier, Nicholas Nesgos, Jeffrey Hellman, Anthony Alva and Matthew Welnicki, and other members of the RGPSQ Enterprise, known and unknown to the Plaintiffs at this time.

100.    This criminal groups' pattern of unlawful sleight of unclean hands by and through what appear to be lawful money collection actions are nothing more than a loan sharking group of bad actors conspiring to topple and usurp control of the Plaintiffs assets by any means necessary. This group has set out to "loan to own" and financially decimate corporate Plaintiffs Gotspace Data  and Ocean Development, and unlawfully incarcerate  Plaintiffs Nicholas Fiorillo.

101.    The RGPSQ criminal Enterprise has attempted to take control of the Gotspace New England Data Infrastructure, by and through the RGPSQ Enterprise Loan Sharking ring, and their pattern of systemic debt collection schemes and frauds upon multiple courts, by way of their multiple unlawful debt collection actions, to expropriate upwards of 1000% interest in fictitious regular and default interest payments, late fees and bogus foreclosure actions,  to collect on debts never due or owning.

102.    The Enterprise, led by Thomas Quinn, Kevin Peters, George Mclaughlin, Raymond Green, Peter and  Samuel Spitalny with the tactical assistance of Alfred Demirjian and his cyber NSO "hackers", utilized this sophisticated digital surveillance software and related equipment to wiretap his electronic devices and spy on him, his family and his business associates, starting as far back as December 2020, actively distributing the Fiorillo's private and confidential information amongst the other members of the Enterprise.

103.    The Enterprise's ongoing  wiretaps  enabled  their  egregious  pattern  of  intimidation,

obstruction of justice and unlawful eavesdropping, motivated by a desire to financially destroy and silence the Fiorillos. These defendants have broken numerous Federal and State laws in their relentless and unlawful pursuit of Fiorillo's assets and business interests.

104.    Defendants Blue Vista, and Townsend and Sheehan intentionally misrepresented to Plaintiff Nicholas Fiorillo over a period of months, their ability to quickly obtain loan commitments for upwards of $150,000,000, from Blue Vista Capital and Sheehan's Capstack Mortgage Brokerage Company, for the entire first phase of the data development project.

105.    These defendants intentionally steered Fiorillo right into their predatory lending trap, with a continued pattern of fraudulent representation of loan commitments, and the promised certainty that "big money" was always just four to six weeks away, was used as additional "bait," to induce Fiorillo, in detrimental reliance, to turn over ownership shares of his Company's Gotspace Data Equity Fund, and upwards of 300% interest returns, to the Defendants.

106.    The pattern of fraudulent manipulation from Fiorillo's so-called "commercial mortgage brokers," Sheehan and Townsend, and the rest of the Enterprise defendants, was clearly predatory in nature, and Plaintiff was ultimately and purposefully placed under financial duress and on the verge of financial ruin.

107.    With no other choice but to either agree to usurious "loan" terms, or lose the $1,000,000 he had already invested , on or about February 15th 2021, Peter Spitalny and the other Defendants, on behalf of Stein Fibers, "bait and switched" Fiorillo into executing predatory loan agreements, then effectuated a series of interstate wire transfers from various entities and investment accounts, into Fiorillo's Gotspace Development's operating account.

108.    The Enterprise's predatory, loan-to-own financing schemes, breach of loan agreements and inter-credit capital agreement breaches with Plaintiff Nicholas Fiorillo, have continued to cost him substantial, quantifiable financial damages, well into the hundreds of millions of dollars. Their sinister undermining, political indulging, and unlawful, multi-faceted, deep three state conspiracy against the

plaintiffs, have tortiously interfered with what could be well over 3,000 construction jobs, and upwards of 5,000 additional jobs for the State of Connecticut and New England in general, from coming to fruition.

109.    Defendants were out to take control of Gotspace Data away from Nicholas Fiorillo by any means possible, including unlawful prosecution of debt collections, in violation of 18 U.S. Code § 1951 - Interference with commerce by threats or violence in addition to numerous federal law claims of breach of loan, investment, and FDIC Regulated Banking contract(s).

110.    Enterprise defendants, did knowingly conspire to defraud, usurp, tortiously interfere with and extort monies and property from, the  plaintiffs' Gotspace Development et al, Ocean Development et al, W-Lofts Development LLC, BSI 254 Westfield St LLC, and others. Some, if not all of these defendants are guilty of fraudulent and unlawful crimes, and have engaged in both actionable civil and criminal conduct against the plaintiffs, which are stated in this instant action.

111.    Defendants committed numerous violations of federal laws, in consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, specifically United States currency, as those terms are defined in Title 18, United States Code, Section 1958(b), ss 924(c)(1) 18 U.S. Code § 1951 - Interference with commerce by threats or violence. Plaintiff Nicholas Fiorillo is still in fear of imminent bodily harm as well as harm to his family, due to the violent threats by Defendants.

112.    The Enterprise defendants have defrauded Plaintiff, by fraudulently deceiving him into forfeiting rights and claims to preferred stock and equities  of the plaintiffs' companies,  investments, bonafide equitable ownership, and future development rights, to Plaintiff's companies Gotspace Data et al, Ocean Development et al, Gotspace Development et al, W-Lofts Development LLC, and BSI 254 Westfield St. LLC, et al.

113.    All of this was put into motion by way of an exchange for a promise by Defendants to Plaintiffs, of access to the necessary capital required to complete their acquisition and future development objectives. Under a "smoke and mirrors" joint venture partnership with Defendants, additional fraudulent

schemes were systematically "presented" to Nicholas Fiorillo.

114.    After a critical, so-called "partnership" formation which ultimately turned out to be a set up, Defendants continued to offer promises of "future" capital to the plaintiffs, always with a quid pro quo demand for additional stock, in the plaintiffs' development companies and real estate holdings, as well as cash which was otherwise not due or owing to them.

115.    Defendant McLaughlin's interest in the Swansea Mall prompted formation of NE Edge LLC, a shell corporation behind which attorneys Mclaughlin, Peters and others could attempt to usurp Plaintiff's Gotspace Data Sites, as well as his other properties, GS Beverly, GS Gloucester, W-Lofts, and 254 Westfield Street.

116.    All of the Defendants stand to benefit financially, if the Plaintiff was to be dispossessed of his business ownership interests, which would then allow Peters, Mclaughlin and the other defendants, to increase their personal stakes in the assets of the plaintiff's. Accordingly, all of the attorney-defendants effectively have a personal interest in this litigation.

117.    From September of 2020 up until this day, the Enterprise defendant attorneys have engaged in conduct, which has not only inflicted undue duress upon Plaintiff Nicholas Fiorillo and his wife, but has included extreme acts of assault, physical battery, and intimidation, which directly caused Mrs. Fiorillo to have a cardiac episode which hospitalized and nearly killed her. Plaintiffs and their family were clearly the prey of these Criminal Enterprise  Defendants, and their illegal "loan-to-own" schemes.

118.    The Enterprise Defendants and attorneys, by and through the unlawful deployment  and tactful targeted, 10,000 specific  "data attack breaches" and over 5000 of hours of unlawful interception of Plaintiffs confidential  and  privileged  communications,  by  and  through  the  cyber   spy  phishing technologies of the NSO and Trackview know as Pegasus "type" zero click infiltrations, on the Plaintiffs T-Mobile cellular carried network. All have been victims of a systemic data breach by this criminal groups "continued electronically "eavesdropped" with their covert "spyware apps" on the Plaintiffs multiple Apple Inc., digital and cellular devices, where Apple Inc. failed to prevent it's alleged iOS

"world safest and most encrypted" operating system from being infiltrated by co-defendants, NSO-Westbridge and Trackview and unlawfully gaining access to the Plaintiffs intellectual property, data and confidential communications of Fiorillo, his family, counsel and data and technology businesses, over the past two years. The co-defendants have failed to protect and assure that Plaintiffs would not fall victim to the thousands of data packet data thefts through the Pegasus "digital-ping-wire-taps cyber phishing" on phone, email and electronic communications, which Attorney Kevin Peters and Samuel Spitalny, with the tactical assistance of Alfred Demirjian, have intercepted "over the air," from their extensive "burner phone(s)/laptop(s) network" in Boston, Albany and Atlanta.

119.    The Defendant's systemic electronic eavesdropping and "cyber-geo-location-pings," to locate and harass and threaten Nicholas Fiorillo has placed him in fear for his and his family's safety. Threats on his life and his family's safety have been perpetrated by the Defendants on their electronic devices and through their attorneys, which have been reported by Fiorillo to the local and Federal authorities.

120.    Unlawfully obtained privileged and confidential digital data has given Defendants and their attorneys an advantage over Nicholas Fiorillo, in certain legal situations, whereby legal filings, threats of extortion and actual, unsolicited extortionist settlement offers, were always perfectly timed and positioned with specific threats on life and financial ruin, which coincided with Fiorillo's confidential communications.

121. This ongoing pattern to interfere with attorney-client privileged communications through illegal "wiretaps," continue to aid and abet the Enterprise's criminal activities, and give an unfair legal advantage to their attorneys, as they willfully conspire to gain unfair legal advantage against Nicholas Fiorillo and his legal team, in courtroom proceedings amounting to little more than illegal debt collection. All in violation of 18 U.S. Code § 2511, the interception and sharing of wire, oral, or electronic communications is unlawful.

## THE GOTSPACE DATA NEW ENGLAND DIGITAL INFRASTRUCTURE ECONOMIC IMPACT STATEMENT

122.   The Gotspace Data and Ocean Companies have positioned themselves as the Master Developers of almost 1,000 acres of land, spread across five data campuses and thirty data centers, consisting of close to six million square feet of digital infrastructure pipeline. When completed, this will become the future home to the many of the world's Fortune 500 companies' data and content providers' digital, AI and data storage needs. The Connecticut Data Tax invective Bill H6514, has set down the foundation for what is destined to become this nation's first truly planned, "hyper-scale digital infrastructure pipeline."

123.   In as little as 5-7 years, the New England region could see the construction of numerous hyper-scale data centers, along with many thousands or more high paying, ancillary and IT jobs, which would benefit all of the states in New England as they become, as David Lehman, Connecticut's Economic Development Director believes, a $750,000,000,000 billion dollar economic development hub, throughout the great states of New England.

124.   Gotspace's master development plan for the New England's Digital Infrastructure Pipeline, was envisioned to ensure that New England would continue to be the nation's most powerful alliance of states in the Union.  As the world has always been dependent on New York's Finance, Banking and Investment Markets, Connecticut's Defense, Education and Insurance Industries, and Boston's Education, Innovation, AI and world-leading medical and pharmaceutical industries, Gotspace's multi-year efforts and investments, which they have tirelessly pursued, have positioned them in a unique and extremely profitable position, to develop what could initially be, a $32,000,000,000 billion dollar  Digital Infrastructure Pipeline. Over the next ten years, this would propel New England to the forefront of the world's Trillion Dollar Data Race, and provide New England with their digital connectivity and data storage needs, for the next half century.

**THE NE EDGE-RGPSO  HIERARCHY OF CONTROL AND COMMAND OF**
**LOAN SHARKING RACKETEERING ENTERPRISE TO TAKE CONTROL OF THE**
**$30,000,000,000 BILLION GOTSPACE DATA NEW ENGLAND DEVELOPMENT PROJECT**

125.    The NE Edge-RGPSQ Plaintiffs in this instant action, Samuel B. Spitalny, Peter Spitalny and Stephen Quillinan, along with their attorneys Mclaughlin, Brier and Peters, have been conspiring in "lock step" with the other RGPSQ members and their attorneys, Nesgos, Welnicki, Hellman, Green and Alva. All of these associates-in-fact take directives from Raymond Green and Peter Spitalny, the de facto "bosses" of this criminal group. RGPSQ members Brian Sheehan, Shawn Townsend, Thomas Quinn and George Mclaughlin are closely related business professionals, who have been conspiring to financially ruin the Litigants, using each others - associate-in-fact attorneys, financial, commercial real estate loans and lending companies, who have conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of certain enterprises' affairs, through a pattern of exploited business relationships with Litigants Nicholas Fiorillo and a pattern of loan sharking, for the purpose of extorting the Plaintiffs digital infrastructure development project, real estate, intellectual property and release of claims it possess against all the defendants.

126.    The Loan-to-Own Enterprise schemes put together and led by Thomas Quinn, George Mclaughlin, Raymond C. Green and Peter Spitalny, followed a common pattern: **(i)** Plaintiffs seeking to finance complex real estate development projects , was promised  loans on terms that were more favorable than those actually presented at the loan closing; **(ii)** if they complained, they were threatened with the loss of funding for the loan, with the attendant risk of losing a deposit or being sued by a seller, and possible foreclosure of other properties financed with the defendants; and **(iii)** repayment of the loans was virtually impossible, as the demand amounts provided by the plaintiffs, often significantly exceeded what was owed according to the loan documents, thereby creating loan-to-value ratios which prevented conventional refinancing.

127.    Defendants  unlawful racketeering enterprise targeted at least 36 interstate commercial properties and 12 business entities sourced and acquired by Fiorillo and his Gotspace and Ocean Development entities, over the past five years and will stop at nothing to illegally loan to own all the

assets of the Gotspace and Ocean Development Affiliate companies in violation of federal law. (Brian Sheehan exhibits)

## THE NE- EDGE RGPSQ POLITICAL CORRUPTION SCHEME  OF THE MASSACHUSETTS JUDICIAL SYSTEM

128.   The NE EDGE-RGPSQ Grand Corruption Scheme now being  perpetrated within the Secret Courts of Massachusetts, has been ongoing since the fall of 2021, when these enterprise members set out to unlawfully usurp and extort control of the Gotspace Data Partners' $30,000,000,000 digital infrastructure development project, exponentially valuable entitlement rights, intellectual properties, trade secrets and controlling corporate stock, by any means possible.

118.   The NE Edge, and their judicial insiders, have completely destroyed any hopes the Plaintiffs had  a "level" legal playing field upon which to defend the frivolous and fraudulent actions brought against them, as their corrupted political/judicial tentacles run north to south and east to west, all throughout the Massachusetts judicial system. The NE Edge-RGPSQ "bosses" Peter Spitalny, Raymond Green and Thomas Quinn, and their attorneys George McLaughlin, Kevin Peters, Michael Brier, Nicholas Nesgos, Mathew Welnikki and Jeffery Helman, have had their hooks deep in the oldest and many say, most corrupt court system in the United States. The Suffolk Superior Court Clerk's Office, the Boston Municipal Court Clerk's Office, the Barnstable County Clerk's Office and even the Boston Police Department Division 1, continue to use their corrupt "judicial powers," in their efforts to unlawfully violate Nicholas Fiorillo's civil liberties and due process of law and equity.

129.   The Ne Edge-RGPSQ members' unclean hands have been pushing forward the groups' "Grand Corruption Scheme" to derail the Gotspace Data Infrastructure Development, which has now been exposed. One cannot look away from the surnames of certain members of this criminal group's soldiers that are still in "power" and all too eager to move their sinister objectives forward, acting as though they have a license to legal "kill," and the rules do not apply to any of them. We must hold all responsible parties who have had a hand in this despicable judicial corruption scandal legal to task, and must fully

investigate and prosecute any corrupt state, municipal, judicial and political consultant "insiders" of the RGPSQ, to expose the last of the "gang that couldn't shoot straight."

130.    Corrupt individuals, who clearly still have a stronghold on the Massachusetts Court System, and who continue to aid and abet the RGPSQ attorneys in their unlawful legal schemes, under a despicable ruse and slight of unclean hands, in what appears to be six unrelated, "legitimate" debt collection lawsuits, when the opposite holds true. Any man or woman of competent mind should see through the RGPSQ Enterprise's grand corruption scheme, undertaken to "loan-to-own" this pro se litigant into financial ruin, and topple Gotspace Data's development objectives in New England.

131.    The RGPSQ members and their racketeering attorneys have perpetrated a "deep state," highly sophisticated judicial and political racketeering scheme, rank with numerous frauds upon this court. In doing so, they have destroyed any hope that Nicholas Fiorillo and his companies would be granted a non-prejudicial, unbiased, fair legal process, in any Superior Court in Massachusetts, if not beyond, since the RGPSQ "powers" have infected all the courts in the land. Nicholas Fiorillo and his family are, in fact, victims of the RGPSQ and the strings they control over the "Boston Secret Court" system, and their old grand scheme of doing things, replete with political corruption and judicial disruption.

132.    The RGPSQ "political insiders" and the corruption they perpetuate have, without question, left Nicholas Fiorillo at the mercy of the unclean hands of a prejudicially biased legal system, that is incapable of availing basic civil rights and due process of law and equities, that every American is entitled to, free from corruption and/or politically-charged impurities.

## THE NE EDGE-RGPSQ ATTORNEYS AND JUDICIAL  INSIDERS AND LAW ENFORCEMENT RACKETEERING  CONSPIRACY TO VIOLATE NICHOLAS FIORILLO'S CIVIL RIGHTS TO DUE PROCESS AND PRIVACY AND COMMIT FRAUD UPON UNITED STATES  JUDICIAL SYSTEM

133.    28 U.S. Code §1927 applies to all cases "in any court of the United States, including the courts of appeals." State Indus. v. Mor-Flo Indus., 948 F.2d 1573 (Fed. Cir. 1991); Reliance Ins. Co. v.

Sweeney Corp., 792 F.2d 1137, 1138 (D.C. Cir. 1986). While this statute is applicable to attorneys only, and not to clients, (Smith Int'l, Inc. v. Texas Commerce Bank, 844 F.2d 1193, 1197 (5th Cir. 1988); Zaldivar; Westmoreland v. CBS, Inc., 770 F.2d 1168, 1173 (D.C. Cir. 1985), liability as to attorneys and clients may be undertaken separately by the Court.

Examples of such fraudulent judicial conduct that warrant a dismissal of claims and actions in their entirety are as follows.

1.   Unlawful Wiretap / Electronic Interception of Privilege Confidential Data

2.   Attempted murder/manslaughter- Threats to Murder

3.   Assault and battery of Plaintiffs and his Wife

4.   Filing of Fraudulent  Vexatious Lawsuits

5.   Filing of Fraudulent Criminal Complaints

6.   Racketeering Conspiracy to Collect Unlawful Debts

7.   Unlawful Conspiracy to  Maliciously Prosecute

8.   Illegal foreclosure and Black Mail

9.   Extortion to Obstruct Justice Witness Tampering

10.   Extortion to collect Debts and Obtain Property

11.   Willful Participation in Judicial Scheme to Violate Civil Rights

134.   The nefarious pattern of the RGPSQ group's fraudulent filing of criminal complaints, bogus referrals to the Attorney General, and what is now six baseless, interrelated, vexatious legal actions, are little more than "garden variety fraud." The standard burden of proof for relief under the unclean hands doctrine, is one of probable causation, and, if need be, an evidentiary hearing is called, in order to flush out the impurities that have been committed against the court.  More often than not, the mere allegation that an attorney and/or his clients were conspiring to file untruthful or unsubstantiated legal briefs, should trigger the properly low threshold, warranting dismissal of their claims.

135.   Never before in recent memory has such an unlawful and "above the law" attack on our legal system been perpetrated by a criminal group. It is "CRYSTAL CLEAR" that Mr. Fiorillo's civil rights have been violated, by multiple licensed attorneys, judicial insiders and political hacks, and one can only imagine how much political and judicial corruption is still at large and tortiously manipulating everyday lives in the Massachusetts court system. The RGPSQ Enterprise members continue to share and distribute almost daily among them, unlawfully intercepted, confidential, attorney-client privileged communications, obtained through the RGPSQ's illegal wiretapping and electronic eavesdropping schemes.

136.   All to give the Ne Edge-RGPSQ an unlawful legal razors edge, to advance their criminal objectives to perpetrate a highly complex and sophisticated racketeering conspiracy, to gain control of Fiorillo's development companies, with profit potential into the billions. These individuals continue, even up to this day, to try to unlawfully prosecute and even incarcerate Nicholas Fiorillo, in order to force him aside and then "capitalize" on his business opportunities.

137.   Through their systemic pattern of "criminal framing" and vexatious filing of fraudulent legal papers littered throughout the courts of Massachusetts the RGPSQ Enterprise endeavors to complete their "grand frame-up scheme," depicting Fiorillo as a financial embezzler, fraudster, and "treacherous borrower" who was attempting to evade lenders, not pay his debts, and defy the Massachusetts rules of civil procedure.

138.   The RGPSQ Enterprise and all of its members attorneys continued to proffer this *knowingly false narrative*, through a pattern of judicial paper hanging and unlawful prosecution of Nicholas Fiorillo, his family and his business associates in the Secret Courts of Boston. These individuals have committed unlawful and outrageous frauds upon the courts, in their relentless attempts to financially ruin, unlawfully incarcerate, and even kill Nicholas Fiorillo, to prevent him from leading Gotspace Data' s Development efforts, which is without question or plausible doubt, the end objective of the RGPSQ

Enterprise, with regard to this instant action, and the related actions against Mr. Fiorillo, Gotspace, et al, before this Court.

139.    All of the members of this criminal group have committed numerous instances of fraud on the United States judicial system, by and through many unlawful violations under 18 U.S.C. § 1961-1968 et seq. This by way of their predatory debt collection schemes, using extortion, loan sharking, equity striping, wiretapping, political and judicial corruption and interference with interstate commerce by threats or violence, threats of financial loss in their attempts to collect unlawful debts.

140.    These individual Defendants and their "shill companies," are associates-in-fact who formed a criminal group of hard money lenders, aka "loan sharks," and attorneys and political "insiders," and have acted in concert, by participating in a RICO predatory debt collection conspiracy against the Plaintiffs. The RGPSQ Enterprise has purported a massive fraud, by filing numerous  bogus lawsuits to collect "debts" into the tens of millions of dollars, money which *is not due or owing to them*, and obligations which *were not in default*, as there were *never any interest payments past due or payable*.

## THE RGPSQ CRIMINAL OBJECTIVES   TO DERAIL THE DEVELOPMENT OF THE GOTSPACE DATA NEW ENGLAND DIGITAL  INFRASTRUCTURE CORRIDOR

141.    The NE Edge-RGPSQ Enterprise's modus operandi (M.O.), is to unlawfully gain control by way of extortion and loan sharking schemes, Gotspace's real estate, intellectual property, and corporate stock interests in Gotspace Data Partners and affiliates, and expropriate Fiorillo's rights to the $30,000,000,000, Gotspace Data Digital Infrastructure project.

142.    On September 8, 2021, RGPSQ member Brian Sheehan articulated and relayed to Fiorillo, direct threats from Peter Spitalny Raymond Green, Shawn Townsend and Thomas Quinn: If their demands were not met and they did not get 90% of the stock valued at $157,000,000 and control of Gotspace Data. Mr. Sheehan laid out exactly what the RGPSQ Enterprise would do, to physically harm, financially ruin and  unlawfully "frame" Fiorillo to gain control of the company and send him to jail. Sheehan went on to threaten/forewarn that the  RGPSQ attorneys would soon begin to file a series of

bogus debt collection lawsuits, and use their political and judicial contacts to also initiate multiple, false, criminal complaints, unless Fiorillo gave in to these demands.

143.    Sheehan stated: "give them what they want, to get them to put their guns down." (In a Sept. 8th call excerpt to be produced at an evidentiary hearing.) When Fiorillo did not relent and turn over what was demanded of him, the RGPSQ Enterprise commenced their vexatious legal attacks, immediately enlisting their politically/judicially controlled court clerks and judicial operatives and began to yank the strings of justice with the RGPSQ unclean hands.

144.    The Enterprise continues to use their political  corrupt "judicial powers," to upend the civil liberties and rights to due process of law of Plaintiffs Nicholas Fiorillo, his associates and the Gotspace Development Corporate Affiliates.  The actions of these criminal Enterprise members and their nefarious attorneys, active and willing racketeers of the Enterprise, have been identified under federal law. See: Feld Entertainment Inc. v. American Society for the Prevention of Cruelty to Animals, 873 F. Supp. 2d 288, n 7, (D.D.C. 2012).

145.    In light of the totality of the criminal actions perpetrated by the RGPSQ Enterprise and their attorneys and all related "deep fake" collection actions involving in their predatory debt collection schemes, this court must grant emergency relief  against  the Defendants in the related cases against Fiorillo, in order to uphold Supreme Justice. It is imperative for this court to send a clear message that as Americans, we will not stand for such a corrupt "Grand Scheme" attack on the legal process and courts anywhere in this great Country.

146.    We, as American citizens, regardless of color, creed or faith, must always be able to rely on the United States legal system, as the strongest pillar of our rights to free speech, fair and equitable due process, and a "fair and reasonable" court system, free from political corruption and criminal activity. The NE Edge-RGPSQ Enterprise has now been exposed for its' illegal games, rooted in a conspiracy of unlawful, predatory collection of debts, in the now six (6) completely intertwined, vicious, and

unsuccessful attempts to "game the legal system." These vexatiously instigated actions to collect clearly unlawful debts and perpetrate outright fraud upon the Courts, must be put to an end.

147.    This court must order the RGPSQ Enterprise members and affiliates, to cease and desist their unlawful attack on our judicial system, and refer these findings to the United States Attorney in the District of Massachusetts, for this Enterprise's unlawful acts of judicial treason upon our courts, and against Nicholas Fiorillo, Gotspace Data, Ocean Development and his affiliated corporations.

148.    Nicholas Fiorillo submits this instant motion with memorandum in support of the same, bolstered by overwhelming, irrefutable evidence, investigative professional expert findings and opinions, supporting corporate emergency actions, and supportive witness statements and affidavits, in order to help prove beyond any reasonable doubt, the unlawful injustices that have taken place in the courts of the great state of Massachusetts.

149.    Within the past few months, extensive, illegal wiretapping evidence have been uncovered, that was all part of the evil plan of the NE Edge-RGPSQ Enterprise, to "loan-to-own" all of this Litigant's property and businesses, and unlawfully extort his money, by any means they found to be necessary. The RGPSQ Enterprise's attempts to "jerry rig" the legal system, to usurp this pro se litigant's civil rights away from him and extinguish any hope of an unbiased and equitable "fair process of law," are politically corrupt and have eroded confidence in our legal system beyond repair. ( see exhibits )

### THE NE EDGE-RGPSQ TACTICAL DEPLOYMENT OF NSO-WESTBRIDGE TRACKVIEW APPLE INC T-MOBILE USE OF THE PEGASUS  CYBER SPYING TECHNOLOGY TO UNLAWFULLY ELECTRONIC EAVESDROPPING AND WIRETAPPING ALL DEFENDANTS

150.    All of the RGPSQ Plaintiffs, Peter Spitalny, Samuel Spitalny, Jake Spitalny, Stephen Quillinan, Alferd Demirjian, Raymond Green, Joan Green and Enterprise member attorneys Kevin Peters, George Mclaughlin, Nicholas Nesgos, Mathew Welnicki, Anthony Alva, Jeffery Hellman, and others, have been willful participants in this unlawful racketeering scheme. They are collectively responsible for well over two years of illegal, electronic eavesdropping and wiretapping, set up in order to unlawfully

obtain, share and circulate amongst this entire group, confidential information, which was then tactically manipulated to "spin" a horribly false narrative, that this litigant is a "fraudster" and and an "embezzler," who has somehow duped a group of criminals, who, between them have collectively invested slightly over $6,000,000 with Fiorillo, under loan agreements where not in default, nor were any payments past due, at the time they sought collection. (NSO-Trackview Exhibit)

151.   The legal actions by the NE-Edge-RGPSQ Enterprise are all tainted by the unlawful interception of Fiorillo's communications, and made part of over 120 fraudulent, conspiratorial legal motions, writs of attachments, TRO's, and contempt motions, in furtherance of the RGPSQ Enterprise's numerous unlawful debt collection actions, now before this court. All told, this group has demanded upwards of $100,000,000 in cash, stock and real estate from Fiorillo and his Gotspace and Ocean entities, under threats that Nicholas Fiorillo would be faced with physical harm, jail, and bankruptcy, as a result of the unclean hands of their criminal group. (See Harwich PD communications and U.S. Attorney Bradford Communications)

152.   If Fiorillo did not succumb to the NE Edge-RGPSQ Enterprise's unlawful demands to turn over his property including his family home, and refrain from pursuit of his civil liberties and due process of law, to address his accusers and defend his rights and seek such counterclaims and relief afforded to him under the United States Justice System, Plaintiffs made threats against not only his prosperity, but life and limb.

153.   Fiorillo never stood a chance in the Suffolk Superior Court, or any lower court for that matter, as the RGPSQ Enterprise attorneys were using illegally obtained attorney-client confidential communications to "game the legal system," before the Fiorillo even had a chance to legally defend and protect himself.

154.   The RGPSQ Enterprise Defendants and their attorneys' conspiracy to "cheat the legal game," has conspired to use their ill-gotten "forbidden fruit from the poisonous tree," over 600,000,000 megabytes of confidential data, recorded calls, legal documents, and intellectual property of Fiorillo's,

which was stolen through the highly sophisticated, unlawful "wiretapping" and intercepting of confidential electronic information, which has been used in their interrelated, predatory debt collection lawsuits now all in front of this court.

155.   This was all by design, to give the RGPSQ members and their racketeering attorneys a sinister and jagged "legal razor's edge," which they have used to shred the sacred cloth of this high Court, leaving pro se litigants helpless. The embezzlement of privileged, confidential, attorney-client information, intellectual property trade secrets and Fiorillo's legal strategies, were fashioned to completely devastate any hope of the Litigant, of ever receiving, in accordance with his absolute civil liberties, his rights to fair and equitable due process, and rights to a fair trial by jury, in the lower courts of Massachusetts.

156.   This criminal pattern of illegal electronic eavesdropping, wiretapping, data breaches and illegal interceptions of communications, used to Fiorillo detriment, was at the core of the RGPSQ Enterprise's nexus of unlawful debt collection actions. These unequivocal illegalities further serve to support an action against the so-called attorneys who chose to undertake a despicable "legal gaming" of the Suffolk, BMC, Bankruptcy and District Courts of Massachusetts as well as the Connecticut courts.

157.   Nicholas Fiorillo prays that this Court award any other relief they deem necessary and just, as called for in the civil penalty awards afforded to litigants, who seek protections under Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C. § 1961-1968 et seq, 1962 (c), (d)et seq.)and (18 U.S.C. 1958(a)(b)(c)), 18 U.S. Code § 1951 - Electronic Communications Privacy Act of 1986 ("ECPA") or the "Wiretapping Act."

## THE NE EDGE-RGPSQ ENTERPRISE GOTSPACE/ OCEAN UNLAWFUL LOAN TO OWN DEBT COLLECTION SCHEMES

158.   In January of 2021, Fiorillo founded Gotspace Data, and set out to create a massive digital infrastructure opportunity in New England, based in the State of Connecticut. Fiorillo has invested upwards of $2,000,000 of his own capital investment, for the benefit of his legitimate company

stakeholders. In the Summer of 2021, RGPSQ Enterprise boss Thomas Quinn usurped $1M "development fees," a payment upfront, in return for what he represented was his real estate broker, development and consultation services, for the data centers needed to bring Gotspace Data's Master Development plan forward in the state of Connecticut, in conjunction with the Connecticut Data Tax Incentive Bill.

159.    After a collaborative, accredited type investment request for start-up funding was proposed to select RGPSQ members for $12.5 million dollars, the Spitalnys purported that their company, Stein Fibers, would be the primary source of capital investment for the Gotspace data opportunity. From the outset of this collective funding commitment, the Spitalnys set out to "bait and switch" Fiorillo, in order to get him to give up equity and corporate control in the Gotspace companies, through a sophisticated, "under-funded" loan-to-own scheme.

160.    Premised upon a loan promise of $12.5 million they never had any intention of funding, the Spitalnys used Stein Fibers, as the "bait," to lure Fiorillo and Gotspace into thinking that they had the financial wherewithal and readily available capital, to invest in the data project.

161.    Terms were then "switched" at the last minute, and Fiorillo was coerced into executing a notes and a promissory agreements in favor of S & Q Data, a "shell company" operated by Jake and Samuel Spitalny and Stephen Quillinan, that was used as a "fence" for Peter Spitalny to launder money into the Gotspace Data investment and left Fiorillo in a "short position" by design of the RGPSQ and he was forced to seek a predatory $3M credit line from hard money lender Raymond Green.

162.    Since the Spitalnys never had the available capital they committed to invest with Gotspace, and they never intended to honor the loan terms and funding requirements, funds originally represented as a capital investment by Stein Fibers, ended up being "pulled down" from the Company's credit line, resulting in the shortfall.

163.    Enterprise head Peter Spitalny. who has now been discovered to have previously been convicted for tax evasion and money laundering, was barred from investing in any Gotspace Development corporations, as all Gotspace and affiliated companies were formed under the 1933 SEC Securities and

Exchange corporate governance regulations. (see: Documentation by Exhibit of the criminal conviction of P. Spitalny) Nicholas Fiorillo, in his corporate capacity on behalf of Gotspace Affiliates, relied to his detriment on the collective promises and reassurances from RGPSQ Enterprise associate and former loan broker Brian Sheehan, and Sheehan's associate Shawn Townsend, of Blue Vista Capital Lending.

164.    Townsend and Sheehan misrepresented their ability to Fiorillo, to broker upwards of the $220 million required, for the development of Gotspace's first Data Center, all part of the RGPSQ Enterprise's plan to "loan-to-own" Fiorillo's personal and business assets. The representations of financing were conditioned upon Fiorillo turning over 10% in Founder level equity, and awarding both Sheehan and Townsend a Board seat, since Townsend and Sheehan knew that Gotspace Data would soon need to acquire the data campus sites it was pursuing.

165.    This pattern of "gas lighting" future promises of credit and capital by the RGPSQ group, conditioned upon the granting by Fiorillo of more stock in the Gotspace company(ies) and as much as a 1500% return on short term "loans," often on the eve of some financial disaster that the RGPSQ Enterprise perpetrated over a two year period, was a designed to "loan-to-own" all of the Fiorillo's property, homes, and data center development rights.

166.    Mr. Fiorillo caused his Gotspace and Ocean Development affiliates to execute loan documents in favor of lenders S & Q Data a/k/a Peter, Jacob and Samuel Spitalny and Stephen Quillinan, for $5.165 million. The full amount of which was promised but never delivered, on the condition that these "lenders" would fund the balance of the $12.5 million originally pledged by the Spitalnys and required by the Gotspace, over the course of the following 45-60 days. S&Q Data agreed that the second note would carry a 24 month term, and that an additional $3.35M-$4.35M would be advanced, to release Nicholas Fiorillo's personal guarantee(s) and repay to him his out-of-pocket investment, which has now reached over $2M, as of November of 2022. (Thomas Quinn Communication)

167.    In the early summer of 2021, a few months after the initial advance by the Spitalny's from what Fiorillo learned was the Stein Fibers credit line, it became clear to Fiorillo that this was all the

capital that would be coming from Spitalny's end, unless and until he gave over even more stock, or predatory returns, on the initial loan(s). The Spitalnys, Townsend and Sheehan were well aware that loan shark Raymond C. Green had prematurely called due, considerable amounts of money he had advanced to Fiorillo's Ocean Development Precinct 1, to cover the "loan-to-own by design" shortfall, after the Spitalny's failed to fully fund the $12.5M they had committed to.

168.    By this time, Fiorillo realized that this was all by design, and all part of this loan-to-own Enterprise's collective efforts to gain control of his companies. As if "on cue" and perfectly timed, Raymond C. Green, Peter Spitalny, Shawn Townsend and Brian Sheehan threatened Fiorillo with multiple foreclosures, including his personal home and other real estate holdings, and the group was demanding $3,000,000 in predatory fees and interest, which wasn't owed. Messrs. Green, Spitalny and another Enterprise associate, Stuart Bornstein, had joined forces to demand 100% control of the extremely valuable data land contracts, as well as a collateral interest in the Gotspace Self-storage assets. Just as the State of Connecticut had passed the most aggressive Data Tax Incentives Development Bill, in the history of the United States.

## THE NE EDGE-RGPSO UNLAWFUL FORECLOSURE AND EXTORTION  SCHEMES TO GAIN CONTROL OF GOTSPACE DATA AND AFFILIATE DEVELOPMENT COMPANIES AND OBSTRUCT JUSTICE

169.    In early August of 2021, in order to appease Raymond Green's extortionate foreclosure demands on the Gotspace development projects and prevent the loss of the Fiorillo family home, Green's extortionate threats forced Fiorillo into a position of having to renegotiate the Enterprise loans, in order to stop the foreclosure of the both his home and the Ocean and Gotspace assets. When Raymond Green first threatened to foreclose on Plaintiff's non-delinquent loans, he demanded that a $500,000 payment be made within 24 hours, or he would force the Plaintiffs into financial ruin.

170.    Left with no other choice but to face foreclosure by Raymond C. Green and have Gotspace go financially bankrupt from lack of funding, Fiorillo was backed into a corner by the other members of

the RGPSQ with the brokers Townsend and Sheehan promising future "take out loans", Fiorillo executed the second note under extreme financial duress. (exhibit)

171.   Threatened with the loss of his family home and the entire Gotspace Data Equity fund collapsing, Fiorillo executed a $9.65M note, and surrendered more equity and profit share to the Litigants, after "accepting an offer he couldn't refuse." All these schemes were artfully perpetrated by this group, as they had been "electronic eavesdropping" on him since at least the mid-winter of 2020.

172.   Gotspace Data never received the balance of the original $12.5 million dollar investment pledged by the Spitalnys, including the balance of the 2" note of $9.65 millions dollars which was never funded at the initial closing in February of 2021. At this point, not only had Gotspace Data Equity Fund not received the balance of $9.65M which should have funded immediately upon execution of the second note, Raymond C Green, the Spitalnys, Shawn Townsend, Brian Sheehan, Thomas Quinn, and their affiliated lawyers and lending companies, banned together and conspired to financially ruin Nicholas Fiorillo, his Gotspace Affiliates, Ocean Affiliates, and W-Lofts, and set up NE Edge , LLC as "shill corporation" with attorney George Mclaghalin and Thomas Quinn as the managers. (exhibit)

### THE RGPSQ NE EDGE DATA DEVELOPMENT  SCHEME AND GAS LIGHTING OF JOHN DOE SELLERS OF 1000ac to PLAINTIFFS AND BAIT AND SWITCH OF THE TOWNS OF WALLINGFORD, GRISWOLD, GROTON, BOZRAH AND NORWICH  CONNECTICUT

173.   The NE Edge-RGSQ Enterprise has set out to strip all the Gotspace development rights away, by tortiously interfering with the sellers of the data land in Connecticut, and misrepresented their interests, to numerous government agencies, elected officials and townspeople. The NE Edge Corporation, purported to be a  "legitimate" data development Company, but was  formed with malicious intent, three days before the Defendants filed their deep fake vexatious debt collection lawsuit,  in order to provide a front for the NE Edge-RGPSQ Enterprise "shell corporation", so the Defendants could hide behind  the curtain,  and  go back  a approach  all  the Plaintiffs,  data  campus site sellers. Where the defendants are attempting  to tortiously interfere,  usurp   contracts  of land,  embezzle  upwards of

$10,500,000 in the Plaintiffs investment into the intellectual property, contract deposits land and extort the Plaintiffs claims it has now brought suit against for the NE Edge-RGPSQ enterprise unlawful acts of Racketeering, and set them free of past, present and future legal claims and suits from the Plaintiffs. (gotspace data campus sites)

174.    All of the enterprise members of NE Edge, are individuals who had previous knowledge of, and were perpetuating controversies and claims over the Plaintiffs assets, data and real estate development rights and intellectual property and the like, involved with some of the other principals of NE Edge, some employees, investors, and sub-contractors. This criminal group is mere days away from executing a $3,500,000 community host development agreement with the Town of Bozrah Connecticut, which has been signed "under the pains and penalties of perjury.", that no such allegations, controversies or claims of any kind exist for NE Edge-RGPSQ and it's development partners. When all the Defendants have been "lying, cheating and stealing" away the Gotspace Data Master Development plans and intellectual property and perjuring themselves in public meetings, negotiating in bad faith with state and municipal officials and attempting to "cover up" what sinister and unlawful actions they have taken against the Plaintiffs.

175.    NE Edge-RGPSQ and its managers George Mclaughlin and Thomas Quinn, claim to be free from these allegations, as well as the claims of unlawful predatory debt collection, common law fraud, embezzlement, threats to kill, money laundering, and the usurping of the 157 acre site located at 123 Farms Road, Bozarah, CT, which they claim is not in any way shape or form related to the now six predatory collection actions, and is free from any past present or future corporate misdeeds or financial crimes, as detailed in this instant motion.

176.    Only a partial listing of the over 147 acts of Racketeering and unlawful debt collection activities, have been raised to this day by this litigant. Nicholas Fiorillo can assure this honorable Court, that this is the just the mere tip of the RGSQ Enterprise's rusty dagger of corruption and greed, and that

Fiorillo is certain that the United States Attorneys in three states, will see that justice is delivered to all of the guilty parties.

177.    Over a matter of years, and by and through a systemic pattern of predatory extensions of credit, predatory lending, loan sharking and extortion to obtain as much as 1000% usurious interest, stock, shares, real estate and capital, the RGPSQ Enterprise perpetrated unlawful debt collection, conversions, money laundering and extortionist extensions of credit, against Fiorillo and one or more of the his affiliate development companies. In a series of highly sophisticated, complex, fraudulently-purported loan sharking lending /investment schemes, the Enterprise set out to "loan-to-own" and "bait and switch," in order to usurp the Gotspace and Ocean assets, real estate and digital infrastructure development business(s) and future development profits.

178.    The Plaintiffs in this action are active and willful participants in the RGSQ Racketeering Enterprise's series of "loan to own" schemes and unlawful debt collection actions, done with deliberacy and malice, and orchestrated to deprive certain financial interests of Nicholas Fiorillo. This, by an assertion of unlawful and predatory collection activities, designed to usurp his bonafide ownership in real estate, digital infrastructure entitlement and development rights, and prior equitable monetary investment, which constitute criminal acts.

179.    Plaintiff Nicholas Fiorillo conducts his development business in the states of Connecticut, Massachusetts, New Hampshire and Rhode Island, as well as in other states, and the RGSQ Plaintiffs reside in Georgia, New York, Ohio, Rhode Island, Connecticut and Massachusetts, as well as abroad.

180.    The RGPSQ Enterprise, as a criminal group, are attempting to foreclose on the Fiorillo's businesses, real estate, development rights, entitlements and intellectual property, they have invested in substantially, and have worked diligently to obtain, from the State of Connecticut and certain local towns therein. Gotspace Data has received valuable municipal community host agreements, to construct data centers, pursuant to the Company's rights to land purchase contracts.

181.    The RGPSQ, members' constant and relentless predatory collection activities, have obstructed the Fiorillo and Gotspace's ability to develop their valuable rights and title to their data campus sites, and receive specific state and local data tax incentive benefits. These are critical to Gotspace's project labor agreement commitments with the State's various labor and construction unions, for the development of Gotspace Data's Digital Infrastructure Master Plan of New England.

182.    It is irrefutable that this unlawful group of individuals, a.k.a. the RGPSQ Enterprise, and now NE Edge, LLC. are "wolves in a loan shark's skin" and its ringleaders, Raymond Green, Peter Spitalny, Thomas Quinn and George McLaughlin and Nicholas Nesgos, along with their co-conspirators, the other RGPSQ attorneys, are without question, a criminal "Enterprise," with a tactical understanding amongst its members, who continue to unlawfully manipulate the judicial system and its processes as detailed herein, to financially decimate and bankrupt Fiorillo, and his Gotspace and Ocean Development Companies.

183.    Fiorillo's intellectual and development property rights to acquire and develop the data opportunity does not extend indefinitely, as community host agreements as well as the State of Connecticut's Data Tax Incentive, are limited in time. The forward path to develop the Gotspace New England Data Corridor, has been decimated by the direct actions of the RGPSQ Enterprise defendants, who intended to cheat Fiorillo and Gotspace out of their rights to fair and equitable due process of law.

184.    This criminal Enterprise's despicable, unlawful behavior, their incessant tortious interference and gaming of the legal system, and political and judicial corruption schemes, coupled with the now blatant and equally tortious interference and outright lies which have been spun to the Bozrah local municipalities, to induce them into a community host agreement under false pretenses, has unlawfully blocked Gotspace's forward path, to develop data infrastructure.

185.    The Spitalny Plaintiffs' conspiring within the RGPSQ Enterprise's predatory, loan-to-own financing schemes, breach of loan agreements and inter-credit capital agreement breaches with the

Litigants, have continued to cost substantial, quantifiable financial damages, well into the hundreds of millions of dollars.

186.    The RGPSQ Enterprise's "loan-to-lawyer-to-own" RICO schemes and political grand corruption efforts, have cost Fiorillo and Gotpace, greatly. The Enterprise's sinister unlawful debt collection, illegal electronic eavesdropping and unlawful gaming of the legal system, ongoing since the at least early winter of 2021, has the underpinnings of political and judicial corruption, and unlawful, multi-faceted, deep three state conspiracy, against the Gotspace Data Development.

187.    The RGPSQ Plaintiffs, by way of their willful "funding" delays, unlawful debt collection actions, and now political and judicial corruptions schemes, have tortiously prevented the beginning influx of what could be well over 3,000 construction, and upwards of 5,000 additional high paying permanent ancillary and direct jobs for the State of Connecticut and New England.

188.    The RGPSQ Plaintiffs are out to take control away from the founder of Gotspace Data by any means possible. Including the unlawful prosecution of debt collections, deep state judicial and political corruption schemes, unlawful wiretapping and interception of attorney-client communications, all in violation of Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C. § 1961-1968 et seq. and (18 U.S.C. 1958(a)(b)(c)), 18 U.S.C. Hobbs Act § 1951 et seq. - Interference with commerce by threats or violence, ``Dodd-Frank Wall Street Reform Act 28 (12 U.S.C. 1831 e) and violations of the Electronic Communications Privacy Act of 1986 ("ECPA") or the "Wiretapping Act," U.S. Code § 1951 - Interference with commerce by threats or violence, in addition to numerous federal law claims of breach of loan, investment, and unlawful obstructions of justice in an official proceeding.

## GOTSPACE DATA OCEAN DEVELOPMENT NICHOLAS FIORILLO REQUEST FOR EMERGENCY RELIEF TO ENJOIN THE NEW EDGE-RGPSA ENTERPRISES ONGOING RACKETEERING ACTS

189.    Plaintiffs  now seeks relief from the court, in order to maintain the status quo and avoid further harm, by way of an immediate dismissal with prejudice of this instant action, and any other relief the court deems fit, including but not limited to injunctions, specific performance, and writ of

attachments, on all of the assets, money, business and land of the Spitalny Plaintiffs and Stein Fibers Ltd, and all the individual members of the NE Edge-RGPSQ. Mr. Fiorillo asks this court to hold hearings on motions and to reach and apply to any and all operating business banking accounts, personal accounts, and other properties, owned by and through all Plaintiffs, pursuant to making restitution to him.

190.    As to specifics, some or all of the Plaintiffs within the RGPSQ Enterprise, did knowingly conspire to obstruct justice, derail Fiorillo's rights to due process of law, as the RGPSQ Plaintiffs set out to defraud, usurp, tortiously interfere with and extort monies and property from, pro se litigant Fiorillo, Gotspace Master Development of the New England Data Corridor Gotspace Development et al, Ocean Development et al, W-Lofts Development LLC, BSI 254 Westfield St LLC, and others.

191.    Some, if not all of the NE Edge- RGPSQ Plaintiffs in related cases, are guilty of fraudulent and unlawful crimes, and have engaged in both actionable civil and criminal conduct against Fiorillo, his family and  his businesses, which are only partially detailed and plead in this instant motion, and may or may not be referenced this instant action.

192.    The Spitalny and Green Plaintiffs , through their "investment lending" business dealings with Fiorillo and one or more of his business interests, ultimately made fraudulent claims in relation to the purchase of the following land and real estate businesses: Gotspace Data, Ocean Development Precinct 1 et al; Ocean Development et al; W-Lofts Development LLC and; BSI 254 Westfield St. LLC, et al.

193.    The RGPSQ Enterprise has defrauded Fiorillo and his Gotspace and Ocean entities, by fraudulently deceiving them into forfeiting rights and claims to preferred stock, and equities of these companies, as well as investments, bonafide equitable ownership, and future development rights, to Gotspace Data et al, Ocean Development et al, Gotspace Development et al, W-Lofts Development LLC, and BSI 254 Westfield St. LLC, et al..

194.    All of this was put into motion by way of an exchange for a promise by the RGPSQ Plaintiffs to Nicholas Fiorillo, of access to the necessary capital required to complete Gotspace's land acquisition and future development objectives. Under a "smoke and mirrors" joint venture partnership

with Fiorillo, additional fraudulent schemes were systematically "presented" to the Gotspace and Ocean Companies.

195.    After a critical, so-called "partnership" formation ultimately turned out to be a "set up," Plaintiffs and the other members of the RGPSQ Enterprise continued to offer promises of "future" capital to Fiorillo, always with a quid pro quo demand for additional stock, in his development companies and real estate holdings, as well as cash which was otherwise not due or owing to them.

196.    The Spitlany Defendants and the other members of the RGPSQ Enterprise, never had any intention of honoring their representations to meet capital investment requirements. Yet the partnership continued on, with bad-faith negotiations of multiple misrepresented loan agreements and fraudulent extension agreements, which Fiorillo was always presented with at "the last minute," timed on the eve of foreclosure(s), default notice(s), and brink of financial ruin. Litigants Nicholas Fiorillo and his family were always under extreme financial duress, fearful of being financially ruined and on multiple occasions. They have been unlawfully threatened with being prosecuted for "crimes" they did not commit, and threatened with physical harm and even death.

197.    By virtue of these predicate Racketeering Acts, both the Plaintiffs and the RGPSQ Enterprise attorneys have committed federal crimes, cheated the legal system, and committed acts of gross political and judicial corruption, and they continue their outright fraudulent schemes upon this court. In reality, the RGPSQ attorneys and Enterprise members knowingly perpetrated a nexus of deceptive debt collection actions and filed fraudulent legal papers, all a way of "cheating and scheming" Nicholas Fiorillo out of his civil rights to a fair and equitable legal process.

198.    Actionable conduct by Enterprise members includes the extortion of settlement demands, the release of counter claims and demand for "repayment" of almost $100,000,000, some $94,000,000 more than the RGPSQ lenders, convicted felons and con-men, originally claimed to be due or owing to them. The RGPSQ Plaintiffs still seek as much as a 1500% "return," including demand for stock, real estate and cash that they are not entitled to.

199,   This criminal Enterprise routinely obstructs justice, engages in wiretaps, witness intimidation and unlawful collection extortionist extensions of credit. "The RGSQ Racketeering Enterprise" continues to commit numerous violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (18 U.S.C.§1961, 1962 (c)(d),et seq.) and (18 U.S.C. 1958(a)(b)(c)), 18 U.S.C §1964 (s,) 18 U.S. Code § 1951, including but not limited to interference with commerce by threats or violence, in addition to a multitude of federal law claims, for breach of loan, investment, and has perpetrated an attack on our judicial system to the detriment of Nicholas Fiorillo, his family, and affiliated Gotspace and Ocean Development companies and close associates.

## THE NE EDGE-RGPSQ ATTORNEYS UNLAWFUL VIOLATIONS OF ATTORNEY CLIENT PRIVILEGE AND WILLFUL AND APPARENT FAILURE TO RECUSE

200.   Enterprise attorneys Mclaughlin, Peters, Brier, Nesgos, Welnicki, Hellman, Alva and others, have all been negotiating on behalf of and advising the RGSPQ Plaintiffs, throughout the concerted Enterprise conspiracy to sell out assets, including the $45,000,000 sale of the Gotspace Self-Storage Assets, from underneath the Gotspace entities and Nicholas Fiorillo.

201.   Attorneys Mclaughlin, Peters, Brier, Nesgos and Welnicki continue to advocate for their own personal interest in Fiorillo's assets, by way of the collection of "recovery fee" agreements, and in Mclaughlin's instance, the $250,000,000 Shoppes at Swansea Redevelopment project, that Fiorillo was the lead developer on. All in direct conflict with the reach and apply litigants, Ocean Investment Holdings, also victims of the RGPSQ Enterprise. It is beyond clear that these Enterprise associates do not intend upon stopping, until they have either "loaned to own" most, if not all of Fiorillo's assets, or the Federal Authorities finally step in, and put a stop to their criminal activity.

202.   The evidence appended hereto as "Exhibits," unequally demonstrates that Plaintiff Samuel B. Spitalny and other members of the RGPSQ Enterprise, are all part of "a continuing conspiracy among highly organized and disciplined criminal groups to engage in supplying illegal [goods and] services." This keenly succinct characterization, taken directly from the preamble written in Massachusetts,

describes **organized crime**, also known in this instant action, as the RGPSQ Racketeering Enterprise.
(exhibit)

## THE RGPSQ ATTORNEYS SYSTEMIC FRAUD ON THE COURTS AND VIOLATIONS OF NICHOLAS FIORILLO'S CIVIL RIGHTS TO DUE PROCESS AND PRIVACY AND ILLEGAL SHARING OF ATTORNEY-CLIENT WORK PRODUCT AND COMMUNICATIONS

203.   Only an organized group of criminals, and like-minded racketeering attorneys, would openly engage in conduct such as unlawful wiretapping, extortion by false report of a crime, usury and criminal harassment. The extensive and conclusive wiretapping evidence set forth by exhibit is only the tip of the iceberg, to underscore the rampant, ongoing conspiracy that Plaintiffs in this instant action, their attorneys, and the plaintiffs in the related actions before this court, and their attorneys, have been perpetrating to the detriment of pro se litigant Nicholas Fiorillo, and his affiliate development companies. Such unlawful conduct by the NE Edge-RGPSQ Enterprise clearly constitutes Fraud on the Court, forming the basis under the Unclean Hands Doctrine, for dismissal of this instant action, with prejudice.

204.   The basic standards governing fraud on the court are reasonably straightforward. As set forth in Cox v. Burke, 706 So. 2d 43, 47 (Fla. 5th DCA 1998): The requisite fraud on the court occurs where "it can be demonstrated, clearly and convincingly, that a party has purposefully set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).

205.   With regard to the instant action and the related cases against Mr. Fiorillo before this Court, the four step process, which requires an examination of the following, has been met: (1) the offending party and his duties, (2) the conduct at issue and its effect on the judicial machinery, (3) the victim's status during the underlying litigation—i.e., whether the harmed party was in a position to recognize and combat the fraud at issue prejudgment—and (4) the relief sought.

206.   It is widely accepted by the courts that advancing falsehoods during the discovery process is a form of fraud on the court. Courts have equitable power to consider an action which seeks a judgment

of dismissal, based upon fraud during the discovery process, or, as in the matters involving this pro se litigant, the extent to which he was permitted discovery, with one-sided discovery against him possibly being the biggest abusive discovery practice of them all.

207.    Discovery abuse also includes trickery, harassment, threats, and interference with depositions, and as set forth in the criminal charges against Plaintiff in this action and in the others, as well as counsel, harassment, threats and interference were par for the course. Conduct such as continually badgering a party to produce information that had already been provided, and

threatening the opposing party and even his wife with "criminal penalties" if the party failed to comply has resulted in attorneys being sanctioned and protective orders issued.

208.    Take a very certain brand of "City on the Hill" lawyering, couple it with dishonest and corrupt behavior by an officer of the court, and with illegal intercepted, wiretapped confidential and protected attorney- client privileged communication, and you have the Enterprise's formula which has systematically been used, to derail Nicholas Fiorillo's civil right to fair and equitable due process of law and equites.

209.    The strongest of arguments can be made that a heinous and despicable ongoing and continuing fraud on the Massachusetts courts and the United States Judicial System, has been perpetrated by the RGPSQ Enterprise Members, and their racketeering attorneys, and now one of the most harmful forms, if not the most harmful form of discovery abuse, attorney deceit has been uncovered.

210.    Here, there are over ten so-called attorneys, who have conspired for over a year now, to upend this pro se litigant's civil rights to a fair judicial process. While it is not up for debate that "the discovery system is designed to facilitate truth-finding," deception during discovery is all too common in the courts. No public secret by any means, is the open and apparent corruption obviously still alive and festering in the BMC and SSC,  better known as the "Secrete Courts of Boston."

211.    In this instant action, it is the sharing of illegally obtained attorney-client information, gathered via the RGPSQ Enterprise's unlawful wiretapping and interception of privileged communication

between Fiorillo and his attorneys, which not only rises to deception during discovery, but violates the civil rights of Mr. Fiorillo, and leaves a stain on this state's and this great Nation's judicial systems. The Commonwealth of Rhode Island is where our country's judicial system was founded, and it shall be where the courts of the United States of America, deliver swift justice to punish those who, for far too long, have corrupted the Rhode Island judicial system, and embarrassed our great nation.

212.     The Electronic Communications Privacy Act of 1986 ("ECPA") or the "Wiretapping Act," provides for criminal and civil penalties against any individual who "intentionally discloses ... to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of [such a] communication." All of these plaintiffs and their counsel have intentionally disclosed and shared the contents of telephonic wire and/or electronic communications, with full knowledge that the information shared was obtained through the unlawful interception of Mr. Fiorillo's private communications.

213.     The conduct at issue enumerated in the criminal charges pending against the Plaintiffs and counsel, and the effect they have on the judicial machinery, goes without saying. It was only when Fiorillo was able to obtain the requisite evidence needed to have charges sworn out in the Orleans District, could he start to combat the fraud perpetrated against him, in a manner which would garner the degree of attention, which the lower courts did not deign to afford to a pro se litigant.

214.     The relief which is prayed for in this Motion, in addition to the cost borne by Fiorillo to defend against these unlawful debt collection actions, is on account of the causation of financial losses suffered by the Nicholas Friorillo, Gotspace Data and its stakeholders, which must be given the strongest of consideration, as well as all other relief under such egregious circumstances, that this Court deems fit to grant.

215.     From the outset of the RGPSQ Plaintiff's initial unlawful debt collection action of 12/21/2021, and now five additional unlawful debt collection lawsuits, the criminal actions of the RGPSQ Enterprise brought to light almost 12 months ago, by Nicholas Fiorillo, by way of the attempts by these

Plaintiffs to collect unlawful debt, should have been deemed prima facie grounds for dismissal by the lower courts long ago.

216.    The RGPSQ Enterprise's "Grand Corruption," and the unclean hands of all members of this criminal group, cannot go without accountability and due punishment. As we now know, for some inexplicable reason, these matters have survived in the courts, until now that is, and there is little secret as to what has been perpetrated by the RGPSQ Enterprise, and their unlawful attorneys.

217.    The presentation of newly discovered evidence in this case, irrefutable proof, expert data, forensic opinions and ongoing affirmative communications with law enforcement, have now put in motion against over 14 individual members of the RGPSQ Enterprise, due to their unlawful acts against Nicholas Fiorillo and his businesses, and the criminality of the RGPSQ Plaintiffs and their racketeering attorneys must see justice served.

218.    By way of review of the totality of facts and evidence, this criminal group's almost two years of unlawful electronic eavesdropping and unlawful interception of digital communications by Nicholas Fiorillo, including his privileged and confidential communications with his legal counsel, are clear and direct violations of his civil liberties, rights to due process and fair equities, guaranteed by the United States Constitution to all American citizens.

219.    Mr. Fiorillo has, without question or doubt, been completely destroyed by the RGPSQ Enterprise and their Grand Scheme of Unlawful Political-Judicial Power and Control, over the Rhode Island Judicial System. The RGPSQ Enterprise must be defeated for all Americans, for the racketeering attacks which have been perpetrated against all of us who rely on the Rhode Island Judicial System, and the United States Constitution.

## COUNT I
## CONSPIRACY TO COLLECT UNLAWFUL DEBTS
## IN VIOLATION OF RICO, 18 U.S.C. §§ 1961 THROUGH 1964
### (Against Enterprise Corps. And Enterprise Member Defendants)

220.    Plaintiffs incorporate all preceding paragraphs by reference.

221.    This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

222.    Each Count I Defendant is a "person" as required by 18 U.S.C. § 1961(3).

223.    The NE Edge Enterprise, consisting of each named Count I Defendants, is an "enterprise" as defined in 18 U.S.C. § 1961(4), made up of various associates who function as a continuing unit, and together engaged in an act of agreement intended to further an endeavor, which, if completed, would extort Plaintiffs assets, investments, acquisitions, development rights, and ongoing business activities. Through the perpetration of a criminal conspiracy to "loan-to-own," in the Count I Defendants fraudulently induced Plaintiffs to enter into note and loan agreements between February 2021 through September 2021  then extorted or conspired to extort consulting fees, cash payments, legal fees, deeds to real estate and various purchase contracts at multiple loan closings and business meetings, when the Plaintiffs where under financial and physical duress by the actions of the defendants. All such "loan to own" schemes where systemically artificed to  usurp and/or embezzled the Plaintiffs property and release of actionable claims against the defendants,  through multiple "shakedown schemes" and the later formation of various shill corporations  (or other channels subject to the Count I Defendants' control) and usurp, embezzle to then be  distributed such  illicit gains, property and assets  from these fraudulent transactions for the benefit of the defendants.

## COUNT II
### EXTORTION, AND LOAN SHARKING
### IN VIOLATION OF 18 U.S.C. §§§ 873, 875, 880
#### (Against Enterprise Corps. And Enterprise Member Defendants)

224.    Plaintiffs incorporate all preceding paragraphs by reference.

225.    This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

226.    Through the perpetration of a criminal conspiracy to assess exorbitant interest rates, sometime as much as 1500%  in extending credit, and engaging in the use of interstate communications of threats of violence, actual violence,  extortion in collecting unlawful debts, the Count I Defendants

perpetrated patterns of criminal usury, extortionate lending, extortionate collecting, and profiting from the "loan sharking" activities committed against all the Plaintiffs for a matter of years as a pattern of unlawful predatory lending and loan to own schemes .

**COUNT III**
**PATTERN OF RACKETEERING ACTIVITY: MULTIPLE INSTANCES**
**OF WIRE FRAUD IN VIOLATION OF 18 U.S.C. § 1343, 18 U.S.C. § 1961(1)**
**(Against Enterprise Corps. And Enterprise Member Defendants)**

227.    Plaintiffs incorporate all preceding paragraphs by reference.

228.    This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

229.    The Count I Defendants agreed to and did conduct and participate in a scheme to defraud by means of false pretenses.

230.    These defendants knowingly and willfully participated in this scheme with the intent to defraud Plaintiffs, by and through interstate wire fraud and investment schemes and artifices to obtain property and monies not due or owing the Plaintiffs from at least December 2020 up and until November 2022 in multiple extortionist multi-million dollar settlement demands not due or owing by and through extortion and blackmail by unlawful and malicious prosecution schemes to "frame up" the Plaintiffs inside the Secret Courts of Massachusetts with the tactful assistance of the Boston Police and detectives Powers and Dugal.

231.    Defendants wired upwards of  $6,000,000 to Gotspace Operating accounts then claimed that over ten times (10X)  that amount was subsequently due and payable to them by their loan sharking and fraudulent investment schemes.

232.    Defendants also conspired to direct or cause payment of approximately $1 million by Plaintiffs, to personal bank accounts registered to Count I Defendant Thomas Quinn, in or around January 10th  of 2021, under the false pretense of "consulting fees".

233.    At various other times, defendants also demanded that funds be wired to themselves, and/or their now defendant attorneys and Enterprise corporations, under the false pretense of

"forbearance." From April 2021 and up and until November 2022. In the NE Edge-RGPSQ tactical "shake down" and settlement demands or else the Plaintiffs would be prosecuted and incarcerated in the defendants "frame-up" of the June 6th , 2022 Boston Police "Operation School House" sting, that was a just a "Boston Garden Variety" BPD-SSC-BMC frame the defendants perpetrated inside the Secret Courts of Boston, and their conspiracy to unlawfully charge the Plaintiff Fiorillo with assault and battery that never took place.

234.   Defendants used interstate wire communications in furtherance of scheme to defraud Plaintiffs, cyber hacking and electronic eavesdropping outlawed NSO-Trackview cyber phishing technology from at least December of 2020 up and until this day, unlawful against the Plaintiffs.

235.   In all instances, the Count I Defendants acted with knowledge and fraudulent intent and malice to defraud, extort and usurp the Plaintiffs' property, development rights and data development entitlements.

236.   In committing these acts, the Count I Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts constitute racketeering activity under 18 U.S.C. § 1961(1).

### COUNT IV - PATTERN OF RACKETEERING ACTIVITY
### MONEY LAUNDERING IN VIOLATION OF 18 U.S.C. § 1956
### (Against Enterprise Corps. And Enterprise Member Defendants)

237.   Plaintiffs incorporate all preceding paragraphs by reference.

238.   This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

239.   Racketeering activity is defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

240.   Under 18 U.S.C. § 1956(a)(1)(A)(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part .. . to

conceal or disguise the nature, the location, the source, the ownership. or the control of the proceeds of specified unlawful activity."

241.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)-(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, usurious loan collection fees and default interest, pledges, legal fees, real estate commission,  gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, in escrow or IOLTA withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond. certificate of deposit, or other monetary instrument."

242.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," in the RICO statute.

243.    The Count I Defendants repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A), by engaging in transactions using bank accounts at financial institutions to further their racketeering activities. They regularly transacted business among themselves and others affiliated with the NE Edge Enterprise, using various corporations including but not limited to: NE Edge, Raymond C. Green, S & J Storage Bros., S & Q Data, GF Funding, BSI 254 Westfield, Stein Fibers, Blue Vista Capital, et al.

244.    On or about, Defendant Thomas Quinn demanded $890,000 from Plaintiffs by way of wire transfers which occurred across state lines, as Quinn is located in the State of Rhode Island,  NE Edge, LLC is located in Connecticut, Blue Vista Capital is located in Illinois and Plaintiffs' operating accounts are located in New Jersey and Massachusetts. On or about Defendants, Peter Spitalny demanded upwards of $500,000 in additional loan and broker commission fees not due or owing by wire. On or about February 10th 2021, Defendant Shawn Townsend demanded $80,000 in additional extortionate fees and upwards of $1,200,000 increased interest cost, at the last minute, "bait and switch" of the related Gotspace

Data and Self Storage loan closings. On or about April 1st 2021 Defendants Raymond Green demanded upwards of an additional $1,000,000 in "loan advance fees" that were not due or owing. On or about, August 5th, Raymond Green, The Spitalny's demanded upwards of $1,000,000 in extortionist loan extension fees and upwards of $25,000,000 in stock and increased membership interest in the Plaintiffs data development project in Connecticut. On or about September 2021, in a large scale "shake down extortion scheme" all the Defendants demanded the Plaintiffs turnover 90% of Gotspace stock and control to them or else the Plaintiffs would be financial ruined, unlawfully criminally prosecuted and incarcerated by the NE EDGE-RGPSQ Criminal Enterprise. ( Brian Sheehan Vegas Conference Call)

245.    Count I Defendants knew that the funds being transferred were derived from the unlawful activities of the NE Edge Loan Sharking Enterprise and other unlawful acts, including numerous offenses listed under 18 U.S.C. § 1961(1), as detailed herein. As such, the Count I Defendants violated 18 U.S.C. § 1956 every time they transacted using funds illicitly derived from the loan sharking transactions against Plaintiffs, and every time payments were made to any one of the member defendants.

**COUNT V**
**PATTERN OF RACKETEERING ACTIVITY: ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S.C. § 1957**

246.    Plaintiffs incorporate all preceding paragraphs by reference.

247.    This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

248.    Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity. One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

249.    This statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense"; it further defines "specified unlawful activity" as the same unlawful

activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1).

250.   The money that the Count I Defendants derived through the loan sharking and kickback scheme and fraudulent dealings were taken at the expense, and to the detriment of, Plaintiff and its affiliates.

251.   Relatedly, through the NE Edge Enterprise and related unlawful kickbacks and other illicit activities, the Count I Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein, which also constitute "specified unlawful activity" under 18 U.S.C. § 1957.

252.   Through this conduct, the Count I Defendants derived proceeds as the perpetrators and beneficiaries of the "specified unlawful activity" from which the funds were derived, and they knew that the money was the product of such activity.

253.   By depositing these funds in at least one bank account held by an interstate financial institution, the Count I Defendants engaged in monetary transactions as defined by 18 U.S.C. §1957(H)(1). When the Count I Defendants engaged in any subsequent withdrawal, transfer, or exchange of these funds, they engaged in further monetary transactions, as defined by 18 U.S.C. §1957(1). On or about, Defendant Thomas Quinn demanded $890,000 from Plaintiffs by way of wire transfers which occurred across state lines, as Quinn is located in the State of Rhode Island, NE Edge, LLC is located in Connecticut, Blue Vista Capital is located in Illinois and Plaintiffs' operating accounts are located in New Jersey and Massachusetts.  On or about Defendants, Peter Spitalny demanded upwards of $500,000 in additional loan and broker commission fees not due or owing by wire. On or about February 10th 2021, Defendant Shawn Townsend demanded $80,000 in additional extortionate fees and upwards of $1,200,000 increased interest cost, at the last minute, "bait and switch" of the related Gotspace Data and Self Storage  loan closings. On or about April 1st 2021 Defendants Raymond Green demanded upwards of an additional $1,000,000 in "loan advance fees" that were not due or owing. On or about, August 5th, Raymond Green, The Spitalny's demanded upwards of $1,000,000 in extortionist loan extension fees and

upwards of $25,000,000 in stock and increased membership interest in the Plaintiffs data development project in Connecticut. On or about September 2021, in a large scale "shake down extortion scheme" all the Defendants demanded the Plaintiffs turnover 90% of Gotspace stock and control to them or else the Plaintiffs would be financial ruined, unlawfully criminally prosecuted and incarcerated by the NE EDGE-RGPSQ Criminal Enterprise.

254. For the foregoing reasons, the Count I Defendants repeatedly violated 18 U.S.C. §1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

## COUNT VI
## PATTERN OF RACKETEERING ACTIVITY
## VIOLATION OF THE TRAVEL ACT, 18 U.S.C. § 1952

255. Plaintiffs incorporate all preceding paragraphs by reference.

256. This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

257. Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of "interstate facilities" to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

258. The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

259. For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers. The Count I Defendants made use of interstate facilities in furtherance of their crimes of money laundering.

260. The Count 1 Defendants used wire transfers to make payments and on information and belief communicated to each other via phone and/or e-mail in order to further their money laundering activities.

261.   The Count I Defendants reside in various states, and used interstate facilities in furtherance of their crimes of money laundering. For example, multiple wire transfers from Plaintiffs' operating accounts in Massachusetts and New Jersey went to the Defendants "shell corporations" in other states, and other Enterprise member defendants domiciled in Georgia, New York, Connecticut, Rhode Island and Massachusetts, conducted business with Plaintiffs with headquarters and/or principal places of business in Massachusetts and Rhode Island.

262.   Any transactions that the Count I Defendants made with vendors or other business partners located in Rhode Island and New York, were also interstate activities that furthered their extortion, loan sharking,  predatory investment activities and money laundering activities, with respect to their loan sharking rackets.

263.   Both to commit acts of extortion and money laundering and to facilitate these acts, the Count I Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on. or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity." Among other things, they intentionally engaged in acts of extortion, skimming (kickbacks) and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956. Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1). These such violations took place by and between the Plaintiffs and all of the Defendants in their perpetration of their loan to own and money laundering schemes between December 2020 and December 2022.

## COUNT VII
## PREDICATE ACTS OF RACKETEERING ACTIVITY AMOUNT TO A PATTERN OF RACKETEERING ACTIVITY UNDER 18 U.S.C. § 1961(5)

264.   Plaintiffs incorporate all preceding paragraphs by reference.

265.   This count is against all the Enterprise Corporation and Member Defendants (collectively the "Count 1 Defendants").

266.     The Count I Defendants committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering. The acts alleged were related to each other by virtue of common participants, a common victim (Plaintiffs), a common method of commission (perpetration of loan sharking, money laundering and wire fraud schemes which fraudulently induced Plaintiffs' business and contracting decisions, to the benefit of the Count I Defendants, as the plaintiffs were fraudulently induced at the execution of the investment and/or loan contracts, then "bait and switched" into unfavorable loan and investment contracts.

267.     Defendants had a common purpose (defrauding and otherwise extracting unlawful payments from Plaintiffs for their personal financial gain, while concealing their unlawful conduct. The Count I Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

268.     As a direct and proximate result of the NE Edge Enterprise and the Count I Defendants' racketeering and other activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principle ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

269.     As a direct and proximate result of the Loan Sharking  Enterprise Defendants' racketeering activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly. any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

270.    The Count I Defendants derived, both directly and indirectly, financial and other benefits as a result of their unlawful loan sharking Enterprise, including but not limited to the kickbacks and other payments they received as a result of their fraud and other enterprise conduct.

271.    The unlawful proceeds from Defendants' Leased Transactions Enterprise were used in part to operate defendants shill corporations, NE Edge LLC, Raymond C. Green, LLC Stein Fibers, LLC Blue Vista Capital, LLC and others, the defendants' other shell corporation "loan sharking fronts," which member defendants Raymond Green, Peter Spitalny, Thomas Quinn and George Mclaughlin, converted as alter egos for the unlawful racketeering activities.

272.    On information and belief, such defendants  commingled their  personal finances with NE Edge, Stein Fibers et al  funds and assets. Moreover, Defendants Green, Spitalny, Quinn, Mclaughlin and Bornstein are listed as the owners of the various entities—notably NE Edge LLC, formed by Defendants as a "shell corporation," they have used to buy out from underneath, back door and usurp from Plaintiffs, upwards of $6,500,000 in purchase contract deposits, and upwards of $1,500,000,000 in data campus development acres. All the rightful property and  ownership interests of the Plaintiffs.

273.    The Count I Defendants maintain control of the NE Edge Enterprise including entities that engage in interstate commerce and whose activities affect interstate commerce.

274.    The Count I Defendants violated 18 U.S.C. § 1962(c) by "conducting or participating, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

275.    The Count I Defendants also violated 18 U.S.C. § 1962(d). which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c), because they knowingly agreed to commit, and subsequently engaged in. a pattern of racketeering activity.

276.    As a result of the Count I Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962, Plaintiffs were injured in their business and property, within the meaning of 18 U.S.C. § 1964. These such violations took place by and between the Plaintiffs and  all of the Defendants in their

perpetration of their loan to own and money laundering schemes between December 2020 and December 2022.

277.    As a result of their misconduct, the Count 1 Defendants are liable to Plaintiffs for losses in an amount to be determined at trial.

278.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees, from the Count I Defendants.

## COUNT VIII
## DIRECT PURCHASE AND INVESTMENT ENTERPRISE THROUGH DEFENDANT "SHELL CORPORATIONS" IN VIOLATION OF RICO
## 18 U.S.C. § 1962(A), (B), (C), (D)

12.    Plaintiffs incorporate all preceding paragraphs by reference.

13.    This count is against Defendants' Enterprise corporations and companies of the Defendant Does (collectively the "Count II Defendants").

14.    Each Count II Defendant is a "person" as required by 18 U.S.C. § 1961(3).

15.    The Direct Purchase and Investment Enterprise consisting of each Count II Defendant, is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from acquisitions, investments. and business activities of Plaintiffs, through fraud, tortious interference, perpetration of a loan sharking and unlawful debt collection lawsuits and legal fee and real estate kickback schemes, in which business and payments were made to Defendants in connection with the Plaintiffs legitimate Development and Investment companies between May 2021  continuing up and until this day.

## COUNT IX
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
## VIOLATIONS OF 42 U.S. CODE § 1985
## (Against Enterprise Member Defendants Peters and Brier)

283.    Plaintiffs incorporate all preceding paragraphs by reference.

284.    Defendants Kevin Peters and Michael Brier, set out to harass and intimidate and  the wife of Plaintiff Nicholas Fiorillo, who has stated in open court that she has no "discovery documents," and

knows nothing of her husband's businesses or real estate investments, as a special needs educator and homemaker caring for her two children.

285.    Despite her complete lack of involvement, Mrs. Fiorillo was ordered to appear at a contempt hearing scheduled for June 6, 2022, without the benefit of counsel accompaniment, as the Fiorillos had recently dismissed their attorney due to a conflict.

286.    Mrs. Fiorillo expressed concern about not having the right to have legal guidance at the hearing, the prospect of which caused her undue stress and exacerbated a pre-existing heart condition which was made known to the Court.

287.    Shortly before the scheduled June 6th deposition of Mrs. Fiorillo, Mr. Fiorillo received a demand letter for tens of millions of dollars, which represented that if he entered into an agreement to pay this money which was neither due or owing to any of the parties involved, his wife would not have to attend the deposition because it would be canceled.

288.    After refusing to capitulate to this blackmail, Mrs. Fiorillo was deposed without counsel by Mr. Peters and Mr. Brier, in clear violation of her civil rights.

289.    As a direct result of the relentless brow-beating by Mr. Peters and threats to Mrs. Fiorillo that she would be jailed if unable to answer the question, and without legal counsel to prevent this, Mrs. Fiorillo had a cardiac episode and collapsed to the ground and is still suffering extreme physical and emotional harm from the direct and proximate causes of unlawful debt collection and unlawful and malicious prosecution of the Plaintiffs by all the defendants.

290.    The conspiracy to violate the civil rights of Mrs. Fiorillo by Defendants Peters and Brier, was the direct and proximate cause of injuries sustained by Plaintiff's wife.

### COUNT X - 43 U.S.C. § 1983
### (Conspiracy Claims against Defendants Peters, Powers and Dugal)

291.    Plaintiffs incorporate all preceding paragraphs by reference.

292.    Municipal Defendants Officer Powers and Detective Dugal, conspired with Enterprise Member Defendant attorney Kevin Peters, to reach an understanding as to how the BPD would deprive

plaintiff Nicholas Fiorillo of his constitutional rights  on the day of Mrs. Fiorillo's Deposition of June 6, 2022. Defendants Powers, Dugal and Peters were all willful participants in this joint activity between the Police as agents of the State, and this private citizen attorney.

293.    Although Defendant Peters was the aggressor in the aftermath of Mrs. Fiorillo's collapse in his office, as he would later concede to, Officer Powers and Detective Dugal went along with the agreement previously made with Peters, that it would be Plaintiff Nicholas Fiorillo who would be charged with the crime of assault and not him.

294.    Each Defendant, knowingly acting for illegal purposes, threatened, intimidated, and maliciously charged and prosecuted plaintiff Nicholas Fiorillo, in order to accomplish unlawful ends, and then continued even after Defendant Peters admitted under oath that he was not assaulted by Fiorillo, which constitutes a conspiracy.

295.    Each of the defendants, knowing that their conduct was illegal, unethical, and unconstitutional, acted in concert for improper and illegal purposes, and assisted and encouraged one another, in violating the plaintiff's rights and continuing to proceed with malicious prosecution of him for opposing the other defendants' attempts to coerce him into signing an unconscionable and usurious "settlement agreement."

296.    In Massachusetts and across the Country, a common law claim of civil conspiracy lies where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." Dunlap v. Cottman Transmission Sys., LLC, 754 §.E.2d 313. 317 (Va. 2014).  Massachusetts law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii} willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." As alleged in the preceding paragraphs herein, Defendants have

conspired to engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs.

297.    Under the statutory claim for civil conspiracy, Plaintiffs are entitled to recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel. Plaintiff is also entitled to "loss of profits."  As such Defendants Boston Police, Detectives Powers, Dugal, the District Attorneys of Suffolk County, the Boston Municipal, Suffolk Superior, Orleans District courts, from at least December 2021 leading up and until this day, systemically harm the Plaintiffs.

**COUNT XI - 42 U.S.C. § 1983**
**(Claims against Defendants Powers, Dugal, and Doe Defendants for Malicious Prosecution)**

298.    Plaintiffs incorporate all preceding paragraphs by reference.

299.    Starting on or about December 2021 and leading up to or about June 6, 2022, Officer Powers, Detective Dugal and Doe Defendants committed or conspired to commit a malicious prosecution of Plaintiff Nicholas Fiorillo, by maliciously causing a judicial process to commence, through contrived criminal charges  against him, without evidence or probable cause, and with malice.

300.    Fabricated evidence was introduced in the criminal proceedings, based upon a fraudulently conducted investigation into the subject incident at the law office of Defendant Kevin Peters. As such Defendants Boston Police, Detectives Powers, Dugal, the District Attorneys of Suffolk County, the Boston Municipal, Suffolk Superior, Orleans District courts, from at least December 2021 leading up and until this day, systemically harm the Plaintiffs.

**COUNT XII -  43 U.S.C. § 1983**
**(Supervisor Liability Claims against Doe Defendants Supervisors in the BPD)**

301.    Plaintiffs incorporate all preceding paragraphs by reference.

302.    Under the facts involving the malicious prosecution of Nicholas Fiorillo, the Doe Defendant police supervisors at the BPD are liable for the violation of his federal civil rights, where said supervisor was not present but his or her conduct caused the injury.  There is a causal connection between

supervisor conduct and injury to Nicholas Fiorillo, whose constitutional rights were violated, a violation caused by a person acting under color of law. malicious prosecution and municipal liability in violation of 42 U.S.C. § 1983. As such Defendants Boston Police, Detectives Powers, Dugal, the District Attorneys of Suffolk County, the Boston Municipal, Suffolk Superior, Orleans District courts, from at least December 2021 leading up and until this day, systemically harm the Plaintiffs.

**COUNT XIII**
**FRAUD**
**(Against Enterprise Member and Corporate Defendants)**

303.  Plaintiffs incorporate all preceding paragraphs by reference.

304.  In Massachusetts, a party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled. and (6) resulting damage to him.

305.  Defendants made false representations, because they represented and warranted to Plaintiffs that: (i) they did not pay or receive any undisclosed referral or other fees to third parties in relation to the Connecticut Gotspace Data  Campus  sites and contracts to purchase, and (ii) the defendant's "pre-negotiated" NE Edge Purchase contracts were over-inflated and not competitive fair market deals, executed in Plaintiffs' best interests and in compliance with all relevant laws of the Rhode Island, Connecticut and Massachusetts Board of Realtor and licensor rules, and Attorneys Code of Conduct.

306.  The facts that Defendants misrepresented or omitted were material. As set forth herein, a central component of Plaintiffs' data land contracts, was the parties' agreement that "no" referral fees to third parties would be paid, and that employees responsible for ensuring the execution of those transactions, would comply with all relevant laws and codes of conduct.

307.  Plaintiffs' execution of the Gotspace Data Land transaction was expressly premised on the understanding that the Company was paying a competitive market price in an arms-length transaction, not one unlawfully inflated by millions of dollars, due to Defendants' fraud and kickback scheme.

308.    Defendants knowingly and intentionally made the above and other misrepresentations or omissions to Plaintiffs, to induce them to enter into land contracts and purchase agreements which Defendants knew involved prohibited and/or undisclosed payments.

309.    The Count I Defendants knew at the time they covenanted not to pay third party referral fees, that they would channel payments through their "shell corporations" via kickback ("Independent Contractor") agreements with John Doe 3rd party consultants, which in turn resulted in payments to Enterprise members and others, in violation of applicable laws and Attorneys Code of Conduct.

310.    Count II Defendants likewise intentionally recontracted the Gotspace Data contract with Plaintiffs, at a price they knew was not the competitive market price represented to them, in accordance with procurement standards, and in some cases 2 or 3 times more than what had been previously negotiated with the sellers.

311.    On information and belief, upwards of $50,000,000, a 2X to 3X increase in purchase price, unbeknownst to the Plaintiffs, was to be split between the Defendants and the sellers, in an illicit kickback scheme.

312.    Defendants made these misrepresentations and omissions with the intent to mislead Plaintiffs and fraudulently expropriate their lease and purchase contracts (on all of the Gotspaec Data Campus Land Contracts for properties), so they could reap tens of millions of dollars in unlawful fees, real estate commission kickbacks and other splits of upwards of $50,000,000, from their inflated "pump, dump, back door" via NE Edge LLC's repurchase of land contracts.

313.    Plaintiffs relied on Defendants' misrepresentations and omissions to their detriment.

314.    Plaintiff entered into lease transactions in reliance on Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Plaintiff's best interests, were in compliance with Attorneys Code of Conduct, and that the price Plaintiff paid for these Data Campus sites, were competitive market prices.

315.     The Defendants knew that Plaintiffs would not have proceeded with the transactions, had they known of the payments channeled to Defendants' insiders, consultants and relatives.

316.     As a direct result of Plaintiffs' reliance on Defendants' material misrepresentations and omissions, they sustained at upwards of $30,000,000,000 (thirty billion dollars) in damages, including but not limited to the realized development profits and equity creation from the construction of Gotspace Data Partners' (30) $1,000,000,000 hyper scale data centers and 5 campus master development centers, and the costs and fees paid to members of the NE Edge Enterprise, on loan and purchase contracts they procured through fraud in the inducement of investment and loan contracts, and NE Edge kickback schemes with the data land sellers.

317.     Plaintiffs' reliance on Defendants' misrepresentations and/or omissions resulted in damages to Plaintiffs. Such Defendants actions had begun on or about December 2020 and are continuing up and until this day.

**COUNT XIV**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL**
**AND/OR BUSINESS RELATIONS**
**(Against Enterprise Member and Corporate Defendants)**

318.     Plaintiffs incorporate all preceding paragraphs by reference.

319.     The elements of tortious interference are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."

320.     Plaintiffs entered into contractual relationships and/or business expectancies with Defendants, their affiliates, and other partners as alleged herein.

321.     Defendants had knowledge of these contracts, relationships, or business expectancies.

322.     Defendants acted intentionally to induce or cause a breach or termination of Plaintiffs' contractual relationships or business expectancies by, among other things, charging fees that were not

authorized by Plaintiffs, and/or were affirmatively prohibited by Plaintiffs' contracts and/or business policies and practices, and otherwise engaging in unlawful conduct that impeded or injured Plaintiffs' contractual or business relationships with non-defendant parties.

323. Plaintiffs have been harmed by, and are suffering from ongoing and imminent threats of additional harm from, Defendants' tortious interference with Plaintiffs' contractual and/or business relations as detailed above.

324. Injury and damages include, but are not limited to: irreparable harm to the business relationships at the affected the Plaintiffs real property data sites; immediate economic damages resulting from inflated and fraudulent transaction costs and non-competitive bidding; damages associated with replacing NE Edge LLC et al, and other Defendant-affiliated entities at the affected sites, which transition involved substantial business time, attorneys' fees, and site responsibilities; and damages caused by site disruption, development delays, and the associated loss of goodwill, and reputational harm. Such unlawful acts took place from at least May of 2020 and are continuing up and until this very day.

325. Although many of these harms are compensable in money damages, the injury to Plaintiff's ongoing business and business relationships is not, and regardless injunctive relief is necessary to prevent the Defendants from spoliating evidence and assets essential to recovery of monetary relief.

## COUNT XV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FROM MALICIOUS PROSECUTION AND THREATS TO INCARCERATE
### (Against Enterprise Members and Corporate Defendants)

326. Plaintiffs incorporate all preceding paragraphs by reference.

327. The defendants intended to inflict emotional distress on the plaintiff and should have known that their conduct would inflict emotional distress on plaintiff Nicholas Fiorillo .

328. The defendants' conduct was extreme and outrageous, beyond all bounds of decency and utterly intolerable in a civilized community.

329.    The distress suffered by the plaintiffs was severe and of the nature that no reasonable person could be expected to endure it.

330.    As a result of the defendants' unconstitutional and unlawful conduct, Plaintiff Nicholas Fiorillo was threatened, intimidated, and maliciously prosecuted, to which he objected because those acts were unlawful and unethical. By and between December 2020 and the Summer of 2022, at the criminal show cause hearing at the BMC: defendants Boston Police, Boston Police detective Powers and Dugal fabricated evidence was introduced in the criminal proceedings, based upon a fraudulently conducted investigation into the subject incident at the law office of Defendant Kevin Peters. As such Defendants Boston Police, Detectives Powers, Dugal, the District Attorneys of Suffolk County, the Boston Municipal, Suffolk Superior, Orleans District courts, from at least December 2021 leading up and until this day, systemically harm the Plaintiffs and subject them to emotional and physical duress.

331.    The plaintiff was disciplined, and suffered damage to his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

## COUNT XVI
## VIOLATION OF FOIA BY THE POLICE AND MUNICIPAL DEFENDANTS FOR FAILURE TO MAKE PROMPTLY AVAILABLE THE RECORDS SOUGHT BY PLAINTIFFS' REQUESTS
### (Against Municipal Defendants)

332.    Plaintiffs incorporate all preceding paragraphs by reference.

333.    Plaintiff Nicholas Fioriollo has a legal right under FOIA to obtain Municipal records and information he has requested in FOIA requests associated with the following as described herein

334.    There exists no legal basis for the Municipality's failure to make these records and this information available to the public from the now 8 different request to turn over the "Operation School House" investigative finds and documents from at least June 25th 2022 and up and until the repeated request for such public information in the 2nd and 3rd weeks of December 2022, so requested to the BPD information and records department.

335.    The Municipal Defendants' failure to make promptly available the records and information sought by Mr. Fiorillo's requests violates FOIA, 5 U.S.C. § 552(a)(3)(A) and (a)(6)(A)(ii) and applicable regulations promulgated thereunder.

**COUNT XVII**
**BREACH OF CONTRACT**
**(Against Enterprise Member and Corporate Defendants)**

336.    Plaintiffs incorporate all preceding paragraphs by reference.

337.    The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.

338.    Plaintiffs and their affiliates executed contracts with Defendants stating, among other things, that Defendants did not have any third party broker, finder, or similar referral contracts or arrangements in relation to the the Gotspace Data Land Contracts , and that the loan sharking transactions and the defendants were providing competitive, fair market deals executed in Plaintiff's best interests and in compliance with all relevant laws and Attorneys Code of Conduct.

339.    Notably, the land contracts between Plaintiff and the Sellers and or affiliated LLCs for the Gotspace Data land contracts  data campus  sites warranted that: (i) there "are no management agreements, service, maintenance or other contracts .. . relating to the Project other than those" that were "disclosed in writing" to Plaintiff; (ii) the Defendant s  "dealt with no brokers, finders or the like in connection with this transaction,"; and (iii) Plaintiff (as Tenant) would not have to pay or reimburse the Defendants -affiliated insiders for any "legal, accounting, or professional fees and costs incurred in connection with lease negotiations."

340.    Defendants knew at the time they induced Plaintiffs to sign contracts concerning the Gotspace Data Campus sites, that they had previously executed "referral" agreements as  part of the "pump and dump" kickback scheme, and that Defendants would in fact charge undisclosed and

prohibited amounts to Plaintiff, including to inflated commissions, unauthorized site fees, and kickback payments they funneled through NE Edge LLC and other Defendants many shell corporations.

341.    Plaintiffs have been damaged as a result of Defendants' knowing breach of their contract provisions and warranties from at least December 2020 and continuing up and until this day.

## COUNT XVIII
## UNJUST ENRICHMENT
### (Against Enterprise Member and Corporate Defendants)

342.    Plaintiffs incorporate all preceding paragraphs by reference.

343.    In Massachusetts, a plaintiff may pursue a claim for unjust enrichment where he demonstrates that he (1) conferred a benefit on the defendant, (2) the defendant knew of the conferring benefit, and (3) the defendant accepted or retained the benefit under circumstances which render it inequitable for the defendant to do so without paying for its value.

344.    Plaintiffs conferred a benefit on Defendants in the form of awarding business contracts, and payments which Defendants procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants  from at least December 2020 and continuing up and until this day.

345.    As alleged above, Defendants knew of the benefits that Plaintiffs conferred upon them, due to fraudulent misrepresentation, and it is unjust that they should retain the benefits of their unlawful activities.

## COUNT XIX
## CONVERSION AND CONSTRUCTIVE TRUST
### (Against Enterprise Member and Corporate Defendants)

346.    Plaintiffs incorporate all preceding paragraphs by reference.

347.    Under Masshachusetts law, conversion occurs where one uses another's personal property as his own and exercises dominion over it without the consent of the owner. Conversion is any wrongful exercise or assumption of authority, personally or by procurement, over another's goods.. "A conversion may be committed by intentionally . . dispossessing another of a chattel," Restatement

(Second) of Torts § 223 (1965), which can occur by intentionally "obtaining possession of a chattel from another by fraud or duress, id, § 221." See also id. § 221 cmt. B ("Onc who by fraudulent representations induces another to surrender the possession of chattel to him has dispossessed the other of the chattel [and] taking possession of the chattel given under such circumstances is ineffectual to constitute a consent to the taking.").

348.    Defendants and/or their affiliates intentionally obtained and exercised dominion and/or control over Plaintiffs' property through fraudulent and otherwise unlawful and inequitable individual and enterprise conduct procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants  from at least December 2020 and continuing up and until this day.

349.    Defendants engaged in such conduct without Plaintiffs' consent, and as a result Plaintiffs are entitled to remedies for Defendants' conversion of Plaintiffs' property including but not limited to assets identified in this complaint.

## COUNT XX
## ALTER EGO/PIERCING THE CORPORATE VEIL
### (Against Enterprise Member and Corporate Defendants)

350.    Plaintiffs incorporate all preceding paragraphs by reference.

351.    In Massachusetts, a court may pierce the corporate veil upon a showing that "(1) the corporation was the alter ego, alias, stooge, or dummy of the other entity: and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime.

352.    With respect to the Defendants loan sharing and real estate kick back scheme NE Edge LLC and other front companies known and unknown to plaintiffs, were alter egos of Thomas Quinn, personally, and Doe Defendants, in executing the Direct Purchase Enterprise agreements. procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants  from at least December 2021 and continuing up and until this day.

353.   Companies NE Edge and CTDCD, LLC were registered to the same address as a former Plaintiffs attorney now Defendant, George Mclaughlin, at Thomas Quinn's employee's personal home address.

354.   That former attorney is listed as the "Managing Director" of NE Edge LLC. Another former Gotspace consultant, Christopher Regan, like Thomas Quinn, have signed multiple offers and even purchase agreements with sellers who are contracted with the Plaintiffs, including sellers in Groton, Griswold and Bozrah, CT.

355.   These defendants likewise signed the purchase agreement between NE Edge,  LLC which has "backdoored" the Plaintiffs' purchase of upwards of $100,000,000 in land contracts, and now has put them at risk upwards of $10,500,000 of capital, which has been invested into Plaintiffs' pursuit of the Gotspace Data Master Development of Digital Infrastructure in New England.  .

356.   NE Edge LLC, and other "front companies" both known and unknown to Plaintiffs, were devices or sham entities used to disguise wrongs, obscure fraud, and/or conceal other unlawful activities in connection with the sale of the Gotspace Data Campus  sites to Plaintiffs, for at least a $50 million premium which the Defendants procured based on false premises.

## COUNT XXI
## VIOLATION OF THE ALIEN TORT CLAIMS ACT
### 28 U.S.C. § 1350
### (Against Technology Defendants)

357.   Plaintiffs incorporate all preceding paragraphs by reference.

358.   The Alien Tort Claims Act ("ATA") provides redress for claims involving aliens who have committed torts in violation of the law of nations (international law) or a treaty of the United States.

359.   Universally accepted norms of the law of nations and international law prohibit systematic abuse of human rights, which includes acts of targeting, harassment, persecution, intentional infliction of emotional distress, as well as acts of invasion of privacy, as enshrined in the UDHR.

360.    The aforementioned monitoring, surveillance, hacking and/or wiretapping of Fiorillo's iPhone constitutes actionable acts under the ATA for the torts of invasion of privacy. The intentional actions aforementioned of invasion of privacy have harmed Fiorillo and the corporate Plaintiffs, from at least December 2020 and continuing up and until this day. Such data breaching being procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants from and continuing up and until this day, in an amount to be proven at trial, and which may allow him to claim punitive damages due to their egregious conduct.

**COUNT XXII**
**VIOLATIONS OF THE FEDERAL COMPUTER**
**FRAUD AND ABUSE ACT 18 U.S.C. § 1030**
**(Against Technology and Enterprise Member Defendants)**

361.    Plaintiffs incorporate all preceding paragraphs by reference.

362.    On information and belief, at all times material to this case, each Defendant was the agent, partner, alter ego, subsidiary, parent, and/or co-conspirator of and with the other Defendant, and the acts of each Defendant were within the scope of that relationship; each Defendant either knowingly and intentionally agreed with, or by negligence and omission failed to prevent, the other(s) to carry out the acts alleged in this Complaint; and in carrying out the acts alleged in this Complaint, each Defendant acted with the knowledge, permission,

and consent of the other, and each Defendant aided and abetted the other.

363.    Fiorillo is an Apple user. His devices are his subscriptions to Apple iPhone device and iCloud. His iPhone is a "computer" as described by the Computer Fraud and Abuse Act, 18 U.S.C. §1030(e)(1). Pegasus software was installed remotely by Samuel Spitalny and/or Alfred Demirjian, removing the need for physical proximity to Fiorillo's and the other targets' smartphones, as well as eliminating any reliance on local mobile network operators. It also circumvented security measures like the use of encryption, allowing Spitalny, Demirjian and others, to access these infected devices as though they were the devices' users.

364.    Defendants Spitalny, Demirjian and others were aware that this software was designed to subvert safeguards that would otherwise alert the targeted user to its presence, and that on Apple iPhones, for example, Pegasus disabled the crash reporting to Apple, with malicious processes that Pegasus runs on devices following an infection, which are then given names similar to those of legitimate iOS system processes.

365.    Fiorillo's iPhone is a "protected computer" as defined by 18 U.S.C. §1030(e)(2)(B) because it is "used in or affecting interstate commerce or communications" in the United States.

366.    NSO, Westbridge and Apple Defendants violated and attempted to violate 18 U.S.C. § 1030(a)(2) because they intentionally accessed, negligently enabled access and attempted to access the iOS operating system in Fiorillo's iPhone and his iCloud account without authorization and, upon information and belief, obtained information from Fiorillo's iPhone and iCloud account belonging to Plaintiff. Defendants violated 18 U.S.C. § 1030(b) by conspiring and attempting to commit the violations alleged in the preceding paragraphs, by deploying and repeatedly accessing computer servers owned by U.S. technology company, Defendant Apple Inc.

367.    NSO, Westbridge and Apple Defendants violated 18 U.S.C. § 1030(a)(4) because they knowingly and with the intent to defraud, aided Defendant Spitalny and Demirjian's access to the operating system on Fiorillo's iPhone, without authorization, using information from the Apple's servers, and then installed highly invasive spyware on Fiorillo's iPhone,and by means of such conduct furthered the intended fraud and obtaining of information about Plaintiff illegally. This access was without authorization from Plaintiffs, as this spyware surreptitiously provided access to the contents of targeted devices of Fiorillo, his family and associates, including cloud accounts, contacts, emails, text messages, GPS locations, and search history.

368.    As a result of the fraud, NSO, Westbridge and Apple Defendants obtained or facilitated the obtaining of, something of extreme value: financial and confidential and privileged information and communications between Plaintiff and others, including information and communications concerning

Fiorillo's businesses, close business associates and his attorneys. The Pegasus attacks have greatly disrupted Plaintiffs' lives and work. These attacks have also compromised Plaintiffs' safety as well as the safety of their family members, friends and business associates. Plaintiffs have also had to expend substantial resources to ensure their personal safety, and to address serious physical and mental health issues resulting from these attacks. The intentional actions aforementioned of invasion of privacy have harmed Fiorillo and the corporate Plaintiffs, from at least December 2020 and continuing up and until this day. Such data breaching being procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants from and continuing up and until this day, in an amount to be proven at trial, and which may allow him to claim punitive damages due to their egregious conduct.

369.   NSO, Westbridge and Apple Defendants' actions caused Plaintiff to incur a loss as defined by 18 U.S.C. §1030(e)(11), in an amount in excess of $5,000.00 during a one-year period, including the expenditure of resources to investigate and remediate NSO's illegal conduct. Plaintiff is entitled to compensatory damages in an amount to be proven at trial, as well as injunctive relief or other equitable relief in accordance with 18 U.S.C. §1030(g).

**Damage to Apple User Devices In Violation Of 18 U.S.C. § 1030(a)(5)**

370.   Plaintiffs reallage and incorporate by reference all preceding paragraphs.

Defendant NSO, Westbridge and Apple violated 18 U.S.C. § 1030(a)(5)(A) because they knowingly caused the transmission of a program, information, code, and/or command, specifically the commands needed to carry out the exploits described above, as well as the Pegasus spyware itself, to Apple's servers, and as a result of such conduct intentionally caused damage without authorization to the operating system on Apple's users' devices, including by installing their Pegasus spyware.

371.   Defendants NSO, Westbridge and Apple violated 18 U.S.C. § 1030(a)(5)(B) because they intentionally accessed Apple's users' devices without authorization and as a result of such conduct,

recklessly caused damage to the operating system on Apple's users' devices, including by installing their Pegasus spyware.

372.   Defendants violated 18 U.S.C. § 1030(a)(5)(C) because they intentionally accessed Apple's users' devices without authorization and as a result of such conduct, caused damage to the operating system on Apple's users' devices, including by installing their Pegasus spyware.

373.   Defendants violated 18 U.S.C. § 1030(a)(2)(C) because they intentionally accessed and/or caused to be accessed Plaintiffs' devices without authorization and obtained information from those devices.

374.   Defendants accessed and/or caused to be accessed Plaintiffs' devices without authorization through attacks that enabled the surreptitious installation of Pegasus on Plaintiffs' devices.

375.   Defendants infected Plaintiffs' devices with Pegasus to enable real-time "ZEROCLICK" 24/7/365 unlawful access to the Plaintiffs most guarded, confidential and priviledge trade and intellectual technology and attorney-client privileged information. All such "cyber hack" information has been used against the Plaintiffs to upend justice.

369.   Such illegal surveillance and gps tracking  of those devices and to exfiltrate data from those devices to Defendants and their clients. Once installed, Pegasus provided Defendants and their clients with essentially unlimited access to Plaintiffs' devices, allowing them to remotely surveil and exfiltrate data contained on those devices and in the cloud-based accounts connected to those devices. The intentional "cyber spying breaches" and unlawful eavesdropping and wiretapping actions aforementioned of  clear and proximate invasion of the Plaintiffs  privacy. Which continues to  have harmed Fiorillo and all the corporate Plaintiffs, from at least December 2020 and continuing  up and until this day. Such data breaching being procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants  from

and continuing up and until this day, in an amount to be proven at trial, and which may allow him to claim punitive damages due to their egregious conduct.

## COUNT XXIII
### (Violation of M.G.L. c. 272, § 99)

377.   It is a crime in the State of Massachusetts to use a device to secretly listen to or record an oral or electronic communication. For nearly two years, Defendant Samuel Spitalny, in conjunction with Defendant-attorney Kevin Peters and aided by Alfred Demirjian of Tech Fusion, embarked upon an electronic eavesdropping campaign, conspiring to arrange for the unlawful wiretapping ot the Apple iPhones of Nicholas Fiorillo, his family members and associates.

378.   Utilizing cyberstalking technology from Defendants NSO, Westbridge and Apple, Spitalny, Peters and others, had Demirjian set up Call Interception, in order to "patch into" live phone calls taking place on the Target phones, in real time as they happen, forwarding the Fiorillo's telephonic communications to a predefined number known as  a "Monitor Number," located in Toms River, New Jersey, where the Plaintiffs know no one and would not have good cause to have a telephone number from this location, show up repeatedly on cell phone statements. The intentional "cyber spying breaches" and unlawful eavesdropping and wiretapping actions aforementioned of  clear and proximate invasion of the Plaintiffs  privacy. Which continues to  have harmed Fiorillo and all the corporate Plaintiffs, from at least December 2020 and continuing  up and until this day. Such data breaching being procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity being perpetrated against the Plaintiffs by all the Defendants  from and continuing up and until this day, in an amount to be proven at trial, and which may allow him to claim punitive damages due to their egregious conduct.

## COUNT XXIV
### EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION FED. R. CIV. P. 64, 65

379.   Plaintiffs incorporate all preceding paragraphs by reference.

380.   All Defendants were engaged in commerce through their business dealings.

381.    Defendants committed civil RICO violations. fraud, tortious interference, civil conspiracy, breach of contract, reformation, unjust enrichment. and conversion, when, in the course of commerce, Defendants paid, received, or accepted money as part of the loan sharking proceeds, kickback scheme and/or other unlawful activities committed by or through the Defendants, the Loan Sharking Enterprise and , and/or the Predatory Investment ;loan to own " Enterprise.

382.    Plaintiffs were not aware of Defendants' unlawful activities or Loan Sharking activities and embezzlement kickback schemes.

383.    Federal Rule of Civil Procedure 65 addresses the authority of a district court to issue "injunctions and restraining orders," and Rule 65(b) states that a district court "may issue a temporary restraining order without written or oral notice to the adverse party or its attorney" where: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

384.    Federal Rule of Civil Procedure 64 complements Rule 65 in stating that. at "the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64. The rule goes on to state that the "remedies available under this rule include," among other things. "attachment, garnishment, replevin, sequestration and other corresponding or equivalent remedies," and that such remedies are available "however designated and regardless of whether state procedure requires an independent action."

385.    Massahusetts law permits a court to award an injunction whether the party against whose proceedings the injunction be asked resides in or out of the jurisdiction where the injunction is sought, and also to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property.

386.   Massachusetts  law further and expressly permits pretrial attachment if the plaintiff sufficiently shows that the defendant "[i]s converting, is about to convert or has converted his property of whatever kind, or some part thereof, into money, securities or evidences of debt with intent to hinder, delay, or defraud his creditors."

387.   Massahsuetss law provides that it is sufficient ground for an action for pretrial levy or seizure or an attachment if the specific personal property sought to be levied or seized, it will be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same.

388.   Plaintiffs are entitled to temporary. preliminary, and permanent injunctive relief enjoining Defendants and their affiliates, agents, and assigns from: (1) disrupting any direct or indirect business or other relationships or vendor performance at or associated with Plaintiffs Gotspace Land Contract Sales; (2) taking possession of and disbursing or otherwise dissipating or converting the forthcoming equity payout that IP] intends to make to Defendants Ne Edge LLC et al  and (3) spoliating, dissipating, converting, misappropriating or depleting any evidence or assets related to the conduct at issue in this suit, including the specific funds and accounts identified in the Declaration and Application accompanying this complaint.

389.   The Count I Defendants conducted and participated, directly or indirectly, in the conduct, management, real estate development Fraudulent Transaction Enterprise's affairs through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5). "Racketeering activity" is defined in 18 U.S.C. §1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud). Anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of "the wires" "for the purpose of executing such scheme or artifice or attempting so to do" under 18 U.S.C. § 1343. "For purposes of

this chapter, the term 'scheme or artifice to defraud includes, but is not limited to, a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

390.     Pursuant to and in furtherance of their unlawful scheme, the Count I Defendants Lease Transaction Enterprise committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud," and by "obtaining money .. . by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

391.     These acts of wire fraud included at least 36 wire payments between January 2022 and August 2022 in over $7,000,000 in "sham   real estate" investment schemes and real estate development schemes, purported to be legitimate legal and business expenses, contract deposits, political lobbyist payment and  consulting fees, travel expenses unbeknownst to the Plaintiffs, the Defendants had  embezzled  millions in  "kickback" payments and  "skims" in their illicit referral/kickback  legal fee "shake down" rackets and "side" agreements perpetrated by and through the many members of the criminal enterprise, These payments and related activities constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(c).

### PRAYER FOR RELIEF

392.     WHEREFORE, Plaintiffs respectfully request that this Court:

393.     Issue an ex parte temporary restraining order enjoining Defendants and their officers, directors, principals, agents, servants, employees. successors, and assigns, and as well as all persons and entities in active concert or participation with them, from:

> i. disrupting any direct or indirect business operations or relationships at Plaintiff's conveying, selling, hypothecating the John Doe Gotspace Data Land Contracts Data Land Purchase Contracts ;  Gotspace Development Self Storage assets, Ocean Development luxury single family assets. Ocean Development Precinct 1 , LLC Gotspace  Data Campus

sites, Ocean Investment Holdings, tenant in common interests of the Shoppes at Swansea. Gotspace Development interest in any and all True Storage Self Storage assets and financial operating accounts.   Restrain all and present liquidation or conveyance   all defendants  and "reach and apply defendants" real property, that is not outside the normal course of business, without specific order of the court and/or agreement to post pre-judgement security for at least $10,000,000,000  in cash security until full adjudication of these claims by jury.

ii. spoliating, concealing, wasting. transferring, or otherwise disposing documents, records, communications, files or other evidence or assets used in, or obtained from, the unlawful activities alleged herein, including but not limited to the specific assets identified herein.

iii Enter preliminary and permanent injunctive relief against Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and as well as all persons and entities in active concert or participation with them:

iv. enjoining any interference with Plaintiffs' ongoing transactions or relationships at the Connecticut Data Campus Sites or Plaintiffs other Self Storage  sites or elsewhere;

v. enjoining any and all of the activity alleged herein, any acts causing any of the injury complained of, and any acts assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activity complained of herein or from causing any of the injury complained of herein; and

vi. enjoining Defendants from using or controlling or in any way disposing, transferring. concealing. wasting or spoliating any evidence, assets, or instrumentalities of the Gotspace Data Land Purchase Contracts as well as any other unlawful activity alleged or addressed herein, including the specific assets listed in the Declaration and Application accompanying this complaint.

394.    Impose a constructive trust on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein, including the preliminary placement in escrow of the specific assets identified in the Declaration and Application accompanying this complaint.

395.    Issue a preliminary injunction Order of Lis Pendens, preventing the sale and/or other disposition of the property located at 1 Railway Bluffs, W. Yarmouth, MA and 4 Glenwood Road, W. Yarmouth, MA, and the real property in Connecticut, more specifically referenced by Exhibit hereto.

396.    Enter judgment on all counts herein in favor of Plaintiff and against the Defendants in the amount of $30,000,000,000 billion dollars, an amount clearly substantiated and warranted as the Plaintiffs posses the exclusive Municipal and coveted State of Connecticut Data Tax incentive opportunities specific for the Gotspace  Data community  host agreements and power purchase agreements to the 5 Campus, 6,000,000 square foot 30 hyper scale data center master development plans that the Plaintiffs set out to accomplish before the tortious interference and loan sharking of the Plaintiffs.

397.    Declare that Defendants' conduct has been willful and that Defendants have acted with fraud, malice and oppression and order the Boston Police Records Division to immediately turn over the full and complete in totality, "Operation School House" , December 2021 up until December 2022 publicly requested documents and information of the Plaintiffs now closed "investigation" of his companies and himself for financial crimes and assault and battery that never took place.

398.    Enter judgment awarding Plaintiff actual damages from Defendants of at least the amounts identified in Plaintiffs' Application of $30,000,000,000 billion, and further damages adequate to compensate Plaintiff for injuries sustained as a cause of Defendants' unlawful activities as alleged herein, including but not limited to interest and costs. in an amount to be proven at trial.

399.    Enter judgment disgorging Defendants' profits and other ill-gotten gains.

400.    Enter judgment awarding statutory treble damages as well as other enhanced, exemplary. and/or special damages, in amounts to be proven at trial.

401.    Enter judgment awarding all reasonable attorneys' fees and costs.

402.    Grant Plaintiff any and all other relief that the Court deems just and proper.


Dated: 12/27/2022                                    Respectfully submitted,

                                                     /s/ Nicholas Fiorillo
                                                     Nicholas Fiorillo
                                                     Pro Se


                                                     /s/Neil Kreuzer
                                                     Neil Kreuzer

                                                     Corporate Counsel
                                                     Law Office of Neil Kreuzer
                                                     268 Newbury St., 4th Floor
                                                     Boston, MA 02116
                                                     (617) 872-5347 Phone
                                                     (617) 739-8484 Fax
                                                     BBO #630976
                                                     Email: nkreuzer@aol.com